2002 SD 111

**STATE of South Dakota, Plaintiff and Appellant,**

v.

**Tony KENYON, Defendant and Appellee.**

No. 22222.

Supreme Court of South Dakota.

Argued May 29, 2002.

Decided Aug. 28, 2002.

Mark Barnett, Attorney General, Ann C. Meyer, Assistant Attorney General, Pierre, for plaintiff and appellant.

Michael J. McGill, Beresford, for defendant and appellee.

GILBERTSON, Chief Justice.

[¶ 1.] Tony Kenyon (Kenyon) was pulled over for a routine traffic violation, when law enforcement discovered a cooler containing $17,180 in cash and a McDonald's bag containing methamphetamine, marijuana, and needles. The trial court granted defendant's motion to suppress the evidence from the car, and refused to admit the subsequent statements of Kenyon and his passenger, on the ground that there was no reasonable suspicion to justify a search of the car. We reverse and remand.

## FACTS AND PROCEDURE

[¶ 2.] At 9:23 p.m. on July 28, 2001, Kenyon was pulled over by Union County Deputy Sheriff Jacob Hayes (Hayes). Hayes had observed Kenyon's car travel-

ing south on I29 near Beresford and had noticed that Kenyon's left rear taillight was broken. Some of the red tape covering the light had come off and white light was showing through.[1] Hayes approached the vehicle and requested Kenyon's driver's license, registration, and proof of insurance.

[¶ 3.] Kenyon produced a valid driver's license and registration indicating the car had recently been purchased. But Kenyon informed Hayes that he had not obtained insurance for the vehicle because he had only purchased the car from a friend the day before. Hayes noticed that the dash was dirty and the car was "full of trash," which he thought was odd for a car that had just been purchased. Hayes looked more closely at Kenyon and noticed that he was sweating, had "pin point" pupils and seemed exceptionally nervous. Kenyon also had slurred speech, but Hayes did not smell alcohol. Hayes requested that Kenyon return to the patrol car with him and Kenyon complied.

[¶ 4.] Hayes informed Kenyon that he was just going to write a warning ticket for the broken taillight and failure to have proof of insurance, but this did not seem to calm Kenyon down. While Hayes was doing a radio check on Kenyon's driver's license, Kenyon informed Hayes that he and his passenger were on their way to Sioux City, Iowa, for a birthday party. Even though Hayes discovered no outstanding warrants or other problems, Kenyon continued to be nervous and jumpy.

[¶ 5.] Hayes left the patrol car and approached Kenyon's passenger. Hayes noticed that she, too, was exceptionally nervous and jumpy. The passenger was wearing a long sleeved shirt and sweating

heavily. She also had constricted pupils and a dry mouth, but seemed to have less difficulty speaking than Kenyon. The passenger indicated that her name was Kristen Rusch (Rusch) and that she did not have a valid driver's license. Hayes returned to the patrol car where Kenyon was waiting and ran a check on Rusch's identity, which revealed nothing unusual. The time was 9:29 p.m.

[¶ 6.] While awaiting the results of Rusch's identity check, Hayes continued to engage Kenyon in conversation. As a result of his drug interdiction training, Hayes was aware that the I29 route between Sioux Falls and Sioux City was known as a drug corridor for methamphetamine traffic. Hayes also suspected that Kenyon's and Rusch's unusual physical symptoms might indicate the use of some form of stimulant. Hayes asked Kenyon whether he could search the car for drugs and other contraband and Kenyon consented. Then Kenyon told Hayes that he could look around the front of the vehicle, but that he could not look in the back because he had "personal shit in there."

[¶ 7.] Based on this conditional consent, Hayes searched the front seat of Kenyon's vehicle and the center console, but found nothing. While Hayes was searching, Kenyon attempted to communicate with Rusch and yelled something from the patrol car. Kenyon returned to his vehicle and withdrew all consent to search. He then demanded that any further search be done with a search warrant. Kenyon also demanded that he be allowed to go because he was late for his social engagement in Sioux City, Nebraska.[2] Hayes informed Kenyon that he would have a drug dog do a search of the outside

---

1. SDCL 32–17–8 requires taillights to be red.

2. The story Kenyon told changed three times. First, the two were going to Sioux City, Iowa, then to Sioux City, Nebraska, and finally to Dakota City, Nebraska.

of Kenyon's vehicle, as it would be less intrusive than having Hayes go through the bags and suitcases in the back of the car. Hayes then radioed dispatch for a canine drug detection unit at 9:33 p.m.

[¶ 8.] Trooper Nick Vlasman (Vlasman) arrived at 9:38 p.m. with the drug dog, Ringo. Vlasman had a short conversation with Kenyon regarding the procedure they would use to search the car and noticed that Kenyon was very nervous, had slurred speech, and constricted pupils. Vlasman did not notice any symptoms of alcohol intoxication. When Vlasman used Ringo to search the exterior of the car, Ringo "alerted" at the front and back driver's side doors and at the crevice between the doors on the passenger side. Ringo also raised his paw and scratched at the driver's door, indicating the presence of drugs. Based upon Ringo's behavior, Vlasman told Kenyon that he was going to search the vehicle. Incident to the search of the vehicle, Vlasman asked Kenyon to empty his pockets to determine whether he had any contraband on him. Kenyon emptied his pockets and revealed a small plastic bag containing what appeared to be marijuana. Vlasman arrested Kenyon for possession of marijuana.

[¶ 9.] While the canine search was being conducted, Rusch was standing in front of the car. When Vlasman approached Rusch, he noted her unusual attire and disheveled appearance. Rusch's zipper on her pants was down. Vlasman asked her if she had been using any illegal substances and she admitted that she had used methamphetamine earlier that evening. Given Kenyon's arrest for marijuana possession and the other unusual circumstances, Hays proceeded to do a more thorough search of Kenyon's car. At about 9:45 p.m., in the backseat of Kenyon's vehicle, Hayes found a McDonald's

bag containing three small ziplock bags of a white powdery substance,[3] another bag of marijuana, and some needles. Vlasman then arrested Rusch and helped Hayes finish the search. Vlasman discovered a cooler containing $17,180 in cash, tinfoil, a three-bar weight scale, and a notebook containing initials and dollar amounts adding up to $17,180.

[¶ 10.] Kenyon and Rusch were both taken to the Union County jail where Kenyon was given warning tickets for the broken taillight and his lack of insurance. The two were booked at approximately 11:41 p.m. On July 30, 2001, Agent Lance Barry (Barry) interviewed Kenyon and Rusch. Both defendants were read *Miranda* warnings and agreed to waive their rights. The interviews, however, were not recorded. Barry kept written notes of what was said, but the notes did not contain the entire conversation. Rusch was interviewed in the presence of her attorney, while Kenyon was not. Essentially, each of the defendants maintained that the contraband belonged to the other. Kenyon did, however, admit to possessing the marijuana. Rusch admitted to ingesting methamphetamine with Kenyon at the time Hayes pulled them over. She also admitted that she had attempted to hide some drugs down the front of her pants, which was why her zipper was undone.

[¶ 11.] Ultimately, Kenyon was indicted on August 21, 2001 for: (1) unauthorized manufacture, distribution, counterfeiting, or possession of a substance with high potential for abuse in violation of SDCL 22–42–2; (2) possession of a controlled substance in violation of SDCL 22–42–5; (3) ingestion of a controlled substance in violation of SDCL 22–42–15; (4) possession of marijuana in violation of SDCL 22–42–6; and (5) possession of drug parapher-

---

**3.** The substance field-tested positive for meth-     amphetamine.

nalia in violation of SDCL 22–42A–3. The State filed a motion to admit incriminating evidence on September 5, 2001. Kenyon filed a motion to suppress the evidence from the car search on September 10. The trial court, after a hearing on November 5, found that Hayes did not have sufficient reasonable suspicion to support an investigative detention beyond the time it would have taken to issue the warnings. The court granted Kenyon's motion to suppress the evidence from the car search, "including the urinalysis test results, admissions, confessions, and all contraband seized." In addition, the court held the State had failed to meet its burden of showing Kenyon had voluntarily waived his rights because: (1) the interview was unrecorded; (2) no attorney was present; and (3) the state did not produce a verbatim transcript or record of the interview. The court also refused to admit the statements from the interviews on the basis that they were "fruit of the poisonous tree." The State appeals, raising the following issues:

1.  Whether reasonable suspicion existed to justify the search of Kenyon's car after he had been stopped for a routine traffic violation.

2.  Whether Kenyon voluntarily waived his Miranda rights.

## STANDARD OF REVIEW

■ [¶ 12.] A trial court's grant of a motion to suppress, based upon an alleged violation of a constitutional right, is reviewed by this Court *de novo*. *State v. Frazier*, 2001 SD 19, ¶ 13, 622 N.W.2d 246, 253 (citing *State v. Stanga*, 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488). The trial court's findings of fact, however, are reversed only if they are clearly erroneous. *State v. Ballard*, 2000 SD 134, ¶ 9, 617 N.W.2d 837, 840 (citations omitted).

## ANALYSIS AND DECISION

[¶ 13.] **1.  Whether reasonable suspicion existed to justify the search of Kenyon's car after he had been stopped for a routine traffic violation.**

■ [¶ 14.] Both the Fourth Amendment to the United States Constitution and Article VI § 11 of the South Dakota Constitution prohibit unreasonable searches and seizures by government officials. This protection also "extend[s] to brief investigatory stops of persons or vehicles that fall short of a traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, 899 (1968)) (additional citation omitted). *See also Ballard*, 2000 SD 134, ¶ 10, 617 N.W.2d at 840 (recognizing *Terry* exception to search and seizure rule). The evidentiary standard in those instances, however, is less than probable cause. *Arvizu*, 534 U.S. at 272, 122 S.Ct. at 750, 151 L.Ed.2d 740; *State v. Sleep*, 1999 SD 19, ¶ 7, 590 N.W.2d 235, 238. "[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989) (additional citations omitted)). *See also Ballard*, 2000 SD 134, ¶ 12, 617 N.W.2d at 841 (requiring "reasonable and articulable suspicion that person is involved in criminal activity unrelated to the traffic violation.").

[¶ 15.] When the United States Supreme Court recently addressed the review of reasonable-suspicion determinations, it required that the appellate court:

> [L]ook at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. This process allows offi-

cers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information. available to them that "might well elude an untrained person."

*Arvizu,* 534 U.S. at 273, 122 S.Ct. at 750–51, 151 L.Ed.2d 740 (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621, 628–29 (1981)). Therefore, "the likelihood of criminal activity need not rise to the level of probable cause" in order. to justify a search incident to an investigative detention. *Id.* (citing *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)).

▪ [¶ 16.] It is undisputed that the officer in this case had a "specific and articulable suspicion of a violation," justifying the initial stop. *See State v. Vento,* 1999 SD 158, ¶ 8, 604 N.W.2d 468, 470. *See also* SDCL 32–17–8 (requiring red taillight). Thus, there is no question that Hayes was entitled to conduct an investigation reasonably related in scope to the traffic violation, including the request for a driver's license, registration, proof of insurance and even a computer check for outstanding warrants. *Id.* ¶ 15, 604 N.W.2d at 471. This investigative detention, however, should "last no longer than is necessary to effectuate the purpose of the stop," *unless* the officer has reasonable suspicion that additional criminal activity is afoot. *Ballard,* 2000 SD 134, ¶¶ 11–12, 617 N.W.2d at 841 (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229, 238 (1983)). Accordingly, we must determine whether the totality of the circumstances gave rise to an objectively reasonable suspicion that Kenyon was guilty of an offense other than the traffic violation.

▪ [¶ 17.] Here, we are faced with a defendant who was legitimately pulled over for a traffic violation. Upon request,

Kenyon was unable to produce proof of insurance. He claimed he had only recently. bought the car, yet it was filthy and full of trash. His account of his (and his passenger's) destination changed three different times. *See, e.g., United States v. Foley,* 206 F.3d 802, 806 (8thCir.2000) (holding nervous behavior and inconsistent story justified reasonable ;suspicion and subsequent search). Kenyon's passenger was wearing a long-sleeved shirt, odd attire for a hot July evening. Kenyon and his passenger acted exceptionally nervous given the minor nature of the violation. They were sweating, had constricted pupils and slurred speech, all of which are physical symptoms of stimulant use. *See, e.g., United States v. Lebrun,* 261 F.3d 731, 733 (8th Cir.2001) (holding identical symptoms justified search); *State v. Hanson,* 1999 SD 9, ¶ 14, 588 N.W.2d 885, 890 (holding odor of burnt marijuana and drug dog's "hit" on car were sufficient to justify search). They were also traveling a known drug corridor for methamphetamine traffic.

▪ [¶ 18.] While each of these factors, in and of themselves, may have been susceptible to an innocent explanation, that is not the test. *Arvizu,* 534 U.S. at 273, 122 S.Ct. at 751, 151 L.Ed.2d 740. An officer "need not rule out the possibility of innocent conduct." *Id.* at 277, 122 S.Ct. at 753, 151 L.Ed.2d 740. *See also Lebrun,* 261 F.3d at 733· (holding "innocent facts, when considered together, can give rise to reasonable suspicion."). The officer's observations and experience, the location, and the underlying circumstances need only reasonably support "a commonsense inference" that additional criminal activity is occurring or about to occur. *Id.* at 276–77, 122 S.Ct. at 752–53, 151 L.Ed.2d 740. Given the totality of the circumstances, we conclude that the facts of this case were sufficient to amount to reasonable suspi-

cion justifying continued detention until the arrival of the drug dog and, once it had indicated drugs were present, probable cause to conduct a search of the vehicle.

■ [¶ 19.] The trial court cites *Ballard* for the proposition that any detention of Kenyon beyond the time it took to issue the warnings for the traffic violations was unconstitutional. 2000 SD 134, 617 N.W.2d 837. We disagree with that application. In *Ballard,* this Court examined a set of facts substantially similar to those at issue here. The officer stopped the defendant for driving erratically. *Id.* ¶ 3, 617 N.W.2d at 839. When he asked the defendant for her driver's license, registration, and proof of insurance, the officer noticed that the defendant seemed " 'very fidgety'—her hands were shaking; she could not sit still; her pupils were constricted; and she had a 'wired' look.' " *Id.* at ¶ 4. The officer suspected methamphetamine use, but told the defendant she was free to leave before calling the drug detection dog or searching her car.[4] *Id.* Even though the officer may have developed a reasonable suspicion of additional criminal conduct, this Court was "concerned with the dubious message we send to law enforcement officers and the public if we validate a procedure allowing officers to falsely tell traffic offenders they are free to go, only for the purpose of eliciting their uncoerced agreement to search their automobiles." *Id.* at ¶ 17. Therefore, we held that telling the defendant she was free to go, essentially eliminated the officer's limited authority to act upon any objectively reasonable suspicions he may have previously developed. *Id.* We did not, however, discount the va-

lidity of the officer's suspicions under the circumstances.

■ [¶ 20.] The length of the investigative detention in this case was not unreasonable. The United States Supreme Court has specifically rejected any "hard-and-fast time limit" regarding *Terry* stops. *See United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615 (1985). *See also Foley,* 206 F.3d at 806 (holding duration of stop was reasonable as it "lasted under thirty minutes."). The investigating officer is not constrained by the time it would have taken to issue the warnings if, in the interim, articulable facts lead him to a reasonable suspicion that other criminal activity is afoot. By the time he had completed his computer check of Kenyon, Hayes had already developed reasonable suspicions regarding Kenyon's incongruous story, his unusual physical symptoms, his exceptional nervousness, and his inconsistent account of his destination. The time from Kenyon's stop until his arrest was less than 25 minutes.

[¶ 21.] In this case, the officer did not tell Kenyon he was free to go. Rather, Hayes developed an objective and reasonable suspicion that Kenyon and his passenger were using methamphetamine, and he acted upon that suspicion. The length of the detention was not unreasonable. Given the totality of the circumstances, we conclude that the trial court erred in finding the search unconstitutional and suppressing the evidence from the search.

[¶ 22.] **2. Whether Kenyon voluntarily waived his *Miranda* rights.[5]**

[¶ 23.] The trial court found that Kenyon had been read a *Miranda* warning

---

4. A search of the vehicle yielded a plastic bag containing marijuana, a plastic bag containing a white powdery residue, and syringes. *Ballard,* 2000 SD 134, ¶ 6, 617 N.W.2d at 839.

5. We note the State has not appealed the trial court's ruling that any statements made by Kenyon, after Hayes had radioed for the drug dog, were incident to a custodial arrest without a *Miranda* warning, and therefore, inad-

before the July 30 interview, but had waived his rights in speaking to the interviewing officer. Nevertheless, the court ruled that the State had failed to carry its burden in showing that Kenyon *knowingly and voluntarily* waived his rights for three reasons: (1) the statement was not recorded by audio or video tape; (2) Barry did not present a complete account of the interview in his testimony; and (3) Barry did not produce a verbatim transcript or record of the interview. Therefore, the court ruled it was "not able to conduct an assessment and evaluation of the interview to determine if it was free and voluntary under the totality of the circumstances test pursuant to *State v. Thundershield.*" *See* 83 S.D. 414, 160 N.W.2d 408 (1968). We are not persuaded by this rationale.

[¶ 24.] Barry testified at the suppression hearing that Kenyon "stated he understood [the *Miranda* warning] and he wished to talk to us." Kenyon did not challenge Barry's foundation, observations, or credibility. Instead, Kenyon objected to Barry's testimony only on the basis that there was "no way to test the reliability of the contents of any admissions made by defendant" without a recording of the interview. Yet there is no requirement, constitutional or otherwise, that an interview must be recorded verbatim in order to be admissible. *See Frazier*, 2001 SD 19, 622 N.W.2d 246 (upholding admission of statements even though three of the five interviews were not recorded); *State v. Anderson*, 2000 SD 45, 608 N.W.2d 644 (rejecting defendant's claims that officers had intentionally failed to record portion of interview where defendant asked for an attorney).

[¶ 25.] Moreover, this Court has repeatedly set forth the factors to be used in determining the voluntariness of a waiver,

none of which includes whether a statement has been recorded. *See Frazier*, 2001 SD 19, ¶ 20, 622 N.W.2d at 255. The standard for determining whether a defendant has knowingly and voluntarily waived his rights is well settled.

Incriminating statements or confessions are not voluntary if, in light of the totality of the circumstances, the will of the defendant has been overborne by law enforcement. When considering the totality of the circumstances, we examine the following factors:

(1) the defendant's age; (2) the defendant's lack of education or low intelligence; (3) the absence of any advice to the defendant of [his] constitutional rights; (4) the length of detention; (5) the repeated and prolonged nature of the questioning; and (6) the use of physical punishment such as deprivation of food or sleep.

A defendant's prior experience with law enforcement officers and the courts is also a factor this Court considers.

*Id.* (citations omitted). Therefore, we reverse and remand for a proper evidentiary hearing to determine whether Kenyon's statement was voluntary in light of these factors.

[¶ 26.] SABERS and KONENKAMP, Justices, concur.

[¶ 27.] ZINTER, Justice, concurs specially.

[¶ 28.] AMUNDSON, Justice, dissents in part and concurs in part.

ZINTER, Justice (concurring specially).

[¶ 29.] I concur and write only to add that at the time the trial court ruled in this case, it did not have the benefit of the United States Supreme Court decision we

missible. Accordingly, we address only the suppression of those statements made during

the July 30 interview, after Kenyon was read a *Miranda* warning.

use in our "reasonable suspicion" analysis today.

[¶ 30.] In analyzing the reasonable suspicion issue in 2001, the trial court considered each of the officers' articulated factors in isolation. The trial court then discounted many of the individual factors because, when standing alone, they were susceptible of innocent explanation. For example, the trial court attached some negative inference to the fact that this was a "young officer." The trial court also discounted the suspicion arising from the observation of trash and junk in the backseat of the vehicle that Kenyon said he had just purchased. The trial court finally discounted the suspect's sweating and nervousness by making the three observations: the trial court observed that there was nothing wrong with wearing long sleeved shirts; it observing that sweating occurs for "numerous reasons"; and it observed that although there was an unusual degree of nervousness displayed, nervousness "standing alone" was not sufficient to establish reasonable suspicion.

[¶ 31.] Unfortunately, at the time the trial court undertook this analysis, it did not have the benefit of the recent decision in *Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). *Arvizu* clarified that courts should not analyze the reasonable suspicion factors standing alone: a process the Supreme Court described as a "divide-and-conquer" analysis. *Arvizu*, 534 U.S. at 274, 122 S.Ct. at 751, 151 L.Ed.2d 740, 750. The Supreme Court also rejected an analysis that discounts individual factors that could have some innocent explanation. *Id.* at 274, 122 S.Ct. at 751, 151 L.Ed.2d 740, 750. The Supreme Court ruled that even though individual factors may be susceptible to innocent explanation, the *Terry* analysis requires that they must be considered together to determine whether a fur-ther investigation is warranted. *Id.* at 274, 122 S.Ct. at 751, 151 L.Ed.2d 740, 750 (citing *Terry*, 392 U.S. at 22, 88 S.Ct. at 1868, 20 L.Ed.2d at 906). The Supreme Court noted that "[a]lthough each of [a] series of acts [is] 'perhaps innocent in itself,' " taken together they may collectively amount to reasonable suspicion and "warrant further investigation." *Id.* at 274, 122 S.Ct. at 751, 151 L.Ed.2d 740, 750. Additionally, the Supreme Court reiterated that in determining whether an officer has a particularized and objective basis for suspecting legal wrongdoing, officers may draw upon their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. *Id.* at 274, 122 S.Ct. at 751–52, 151 L.Ed.2d 740.

AMUNDSON, Justice (dissenting in part and concurring in part).

[¶ 32.] I dissent on issue one for the same reasons I have dissented in Fourth Amendment cases on numerous prior occasions. *See, e.g., State v. Hodges*, 2001 SD 93, ¶¶ 27–31, 631 N.W.2d 206, 212–13 (Amundson, J., dissenting) (stating "the majority has all but eviscerated general principles of Fourth Amendment jurisprudence...."); *State v. Faulks*, 2001 SD 115, ¶¶ 25–33, 633 N.W.2d 613, 620–22 (Amundson, J., dissenting) (discussing unreasonable search and seizure); *State v. Buchholz*, 1999 SD 110, ¶¶ 40–52, 598 N.W.2d 899, 906–10 (Amundson, J., dissenting) (discussing overbreadth of the exigency exception to the warrant requirement).

[¶ 33.] All of these writings elucidate the severe erosion of citizens' rights against unreasonable searches and seizures. It appears as though citizens no longer possess any constitutional rights the moment they seat themselves in their

vehicles and start down the public roads and highways. Today, Fourth Amendment jurisprudence simply encompasses too many buzzwords, which have swallowed the protections created by our forefathers.

[¶ 34.] The order of suppression should be affirmed.[6]

---

6. This record clearly evinces a classic example of a fishing expedition. The transcript of the suppression hearing provides as follows:

Q. At this point, why were you going to talk to the passenger?

A. [Hayes] Mr. Kenyon still seemed a little— seemed nervous. He didn't have any warrants. The vehicle was not coming back as stolen or anything. I haven't informed him of anything like that so I went up, thought that maybe he was possible aware that she [the passenger] had warrants or that something else was wrong in the vehicle. So I went to make contact with her, see if she seemed nervous about the situation.

Q. What do you mean there might be something else wrong with the vehicle?

A. Something inside the vehicle that he's concerned about. Gives me another chance to go up there and make contact with her, if I see something else laying around. He was still nervous even though I had informed him by that point that he was just going to be getting warnings. I thought that there might be possibly something else wrong still.