2004 SD 33

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Lucas Jeffery WILSON, Defendant and Appellant.**

No. 22655.

Supreme Court of South Dakota.

Argued Oct. 8, 2003.

Decided March 10, 2004.

Lawrence E. Long, Attorney General, Craig M. Eichstadt, Deputy Attorney General, Pierre, SD, for plaintiff and appellee.

Veronica L. Duffy of Duffy & Duffy, Rapid City, SD, for defendant and appellant.

GILBERTSON, Chief Justice.

[¶ 1.] Lucas Wilson (Wilson) was a passenger in a car that was stopped after a highway patrol officer noticed objects dangling from the rearview mirror and observed the vehicle crossing the fog line. Upon stopping the vehicle, the trooper became suspicious of drug use. The ensuing search of the vehicle revealed methamphetamine, marijuana, and various drug paraphernalia. Subsequently, the trooper placed Wilson under arrest. A grand jury indicted Wilson on four counts of various drug offenses, including possession of methamphetamine, ingesting a substance other than alcohol for purposes of becoming intoxicated, possession of marijuana less than two ounces, and possession of drug paraphernalia. After waiving the right to a jury trial, Wilson was convicted on all four counts. Wilson appeals the trial court's judgment and argues that evidence seized from the vehicle should have been suppressed. For the reasons set forth below, we affirm the trial court's judgment.

## FACTS AND PROCEDURE

[¶ 2.] On the morning of February 16, 2002, Wilson was a passenger in a vehicle owned and driven by Jeremy Neff (Neff). At approximately 7:00 a.m., Trooper Ryan Mechaley (Mechaley) of the South Dakota Highway Patrol observed Neff's vehicle cross the fog line and noticed objects dangling from the vehicle's rearview mirror. Mechaley then proceeded to stop the vehicle for these traffic violations. After obtaining identification from both Neff and Wilson, the trooper asked Neff to follow him back to his patrol car. Wilson remained in Neff's vehicle.

[¶ 3.] Once in the patrol car, Mechaley told Neff that he intended to write him a warning ticked for the traffic violations and that he would then "get [him] on down the road." While Mechaley ran a check on Neff's and Wilson's licenses, he engaged Neff in general conversation. In the approximately fifteen minute long conversation, Mechaley and Neff discussed Neff's employment, birth date, and each made observations about drug-related topics. Neff, however, became somewhat agitated when Mechaley asked him about methamphetamine use in the area, and he twice

attempted to change the subject. During the conversation, Mechaley noticed Neff's pupils appeared to be "pinpoint," a sign that, in the trooper's experience, often indicated methamphetamine use. When asked, Neff denied any current drug use but admitted past methamphetamine use.

[¶ 4.] Based upon the conversation and the appearance of Neff's pupil's, Mechaley became suspicious of drug use. He then asked for Neff's permission to search the vehicle. Neff responded he had received advice from an attorney in Idaho that he should not give consent to such a search. The trooper responded that this was "bad advice" and that "you're in South Dakota now." After Mechaley indicated he felt he had enough reasonable suspicion to call for a drug dog, Neff consented to the vehicle search.

[¶ 5.] Trooper Mechaley then directed Wilson to step out of the vehicle and told him to stand directly in front of his patrol car. Mechaley proceeded to question Wilson. During the questioning, the trooper's voice was commanding and accusatory, and his questions assumed Wilson's guilt. Despite the fact that Wilson was not free to leave during this questioning, the trooper failed to advise Wilson of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Subsequently, Wilson made several incriminating statements regarding drug use. In addition, Wilson appeared to make numerous uncontrollable head and arm movements during the questioning, symptoms which further suggested the use of methamphetamine.

[¶ 6.] Based on Neff's consent, Mechaley began a search of the vehicle. Within a short period of time, the trooper found a hypodermic needle cap between the floorboard and the door. Fearing that he may be injured by an uncovered needle, Mechaley asked Wilson to show him where any

drugs were in the vehicle. Wilson proceeded to locate a sunglass case under the passenger seat. In the case, the trooper found syringes, methamphetamine, marijuana, and a marijuana pipe. Because Wilson indicated that the drugs were his, Mechaley placed Wilson under arrest and read him his *Miranda* rights. Subsequent tests indicated Wilson's urine was positive for methamphetamine and marijuana.

[¶ 7.] A grand jury indicted Wilson on several drug-related charges. Before trial, Wilson made motions to suppress his statements and any evidence found in Neff's vehicle. The trial court found Wilson was subjected to custodial interrogation without being advised of his *Miranda* rights. Therefore, the trial court suppressed these statements, and the state does not appeal this ruling. The trial court ruled, however, that the evidence found in the vehicle should not be suppressed because Mechaley had reasonable suspicion to stop the vehicle and Wilson lacked standing to challenge whether or not Neff's consent was voluntarily given. Wilson waived the right to a jury trial. After the parties stipulated to a set of facts, the trial court found Wilson guilty of possession of methamphetamine, ingesting a substance other than alcohol for purposes of becoming intoxicated, possession of marijuana less than two ounces, and possession of drug paraphernalia. Wilson raises three issues for our review:

1. Where a vehicle has objects dangling from its rearview mirror and crosses the fog line, does an officer have a reasonable suspicion in order to justify a traffic stop.

2. Where an officer tells a driver at the beginning of a traffic stop that he will "get [him] on down the road" and then detains the driver after becoming suspicious of drug use, is the Fourth Amendment's prohibition

against unreasonable searches and seizures violated.

3. May a passenger in a vehicle challenge the validity of the driver's consent to a vehicle search.

## STANDARD OF REVIEW

■■■ [¶ 8.] We review motions to suppress founded on alleged constitutional violations under the de novo standard. *State v. De La Rosa,* 2003 SD 18, ¶ 5, 657 N.W.2d 683, 685 (citing *State v. Rechtenbach,* 2002 SD 96, ¶ 6, 650 N.W.2d 290, 292 (citations omitted)). "[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." *State v. Hirning,* 1999 SD 53, ¶ 9, 592 N.W.2d 600, 603 (quoting *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996)). We will only reverse a trial court's findings of fact if they are clearly erroneous. *De La Rosa,* 2003 SD 18, ¶ 5, 657 N.W.2d at 685 (citing *State v. Hodges,* 2001 SD 93, ¶ 8, 631 N.W.2d 206, 209). It is well settled that "[o]nce the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo." *Hirning,* 1999 SD 53, ¶ 8, 592 N.W.2d at 603 (citation omitted).

■■■ [¶ 9.] Statutory interpretation is also a question of law reviewed under the de novo standard. *Steinberg v. State Dept. of Military & Veterans Affairs,* 2000 SD 36, ¶ 6, 607 N.W.2d 596, 599 (citing *Zoss v. Schaefers,* 1999 SD 105, ¶ 6, 598 N.W.2d 550, 552 (citation omitted)). In construing a statute, we presume "that the legislature did not intend an absurd or unreasonable result" from the application of the statute. *State v. I–90 Truck Haven Service, Inc.,* 2003 SD 51, ¶ 3, 662 N.W.2d 288, 290 (citing *Martinmaas v. Engelmann,* 2000 SD 85, ¶ 49, 612 N.W.2d 600, 611).

## ANALYSIS AND DECISION

[¶ 10.] **1. Where a vehicle has objects dangling from its rearview mirror and crosses the fog line, does an officer have a reasonable suspicion in order to justify a traffic stop.**

■■■ [¶ 11.] The Fourth Amendment to the United States Constitution and Article VI § 11 of the South Dakota Constitution protect the people from unreasonable searches and seizures by government officials. Generally, any seizure of personal property without a warrant is considered per se unreasonable. *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983). The United States Supreme Court, however, has recognized the "narrow authority of police officers ... to make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers,* 452 U.S. 692, 698, 101 S.Ct. 2587, 2591, 69 L.Ed.2d 340 (1981) (citing *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968)). Brief, investigatory traffic stops fall within this exception. *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002). "An investigatory stop satisfies the Fourth Amendment if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *De La Rosa,* 2003 SD 18, ¶ 7, 657 N.W.2d at 686 (citing *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884, 20 L.Ed.2d at 911). *See also State v. Ballard,* 2000 SD 134, ¶ 12, 617 N.W.2d 837, 841 (requiring "reasonable, articulable suspicion that [a] person is involved in criminal activity unrelated to the traffic violation."). If upon further investigation an officer develops probable cause to believe either the driver or a passenger has committed a crime, a warrantless arrest "is consistent with the Fourth Amendment." *Maryland*

*v. Pringle*, 540 U.S. ——, ——, 124 S.Ct. 795, 799, 157 L.Ed.2d 769 (2003). Searches based upon consent do not violate the Fourth Amendment so long as the consent was voluntary and not the product of coercion. *United States v. Welerford*, 356 F.3d 932, 935 (8thCir.2004) (quoting *United States v. White*, 42 F.3d 457, 459 (8thCir.1994)).

[¶ 12.] Wilson first challenges the constitutionality of the initial stop of Neff's vehicle. We have recognized that "[a] passenger in a vehicle has standing to challenge the stop of a vehicle because a stop is a seizure of all persons in the vehicle." *State v. Krebs*, 504 N.W.2d 580, 584 (citing *United States v. Erwin*, 875 F.2d 268, 270 (10thCir.1989)); *see* WAYNE R. LA-FAVE, SEARCH AND SEIZURE § 11.3(e) (3d ed. 1996) ("If either the stopping of the car or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations.").

[¶ 13.] In its findings of fact, the trial court found Mechaley stopped Neff's vehicle because it crossed the fog line and had objects dangling from its rearview mirror. Wilson disputes the presence of dangling objects in the car and argues that even if he crossed the fog line, he did not violate South Dakota law. Thus, according to Wilson, Mechaley lacked the requisite reasonable suspicion to stop the vehicle in the first place.

[¶ 14.] Wilson argues there is insufficient evidence to establish the presence of dangling objects in the vehicle. According to SDCL 32–15–6 "[i]t is a petty offense for any person to drive any vehicle upon a highway with any object or gadget dangling between the view of the driver and the windshield of the vehicle." The trial court found that there were objects dangling from the vehicle's rearview mirror, and in order for this Court to reverse this finding, the trial court must have been clearly erroneous. *De La Rosa*, 2003 SD 18, ¶ 5, 657 N.W.2d at 685.

[¶ 15.] Wilson offers several reasons why the trial court was clearly erroneous in finding that there were objects dangling from the rearview mirror. No objects can be seen in the stop video, and the State never presented any objects into evidence. Wilson also believes Mechaley's testimony was inconsistent regarding the nature of the dangling objects.

[¶ 16.] After reviewing the record, we believe Wilson has not established that the trial court was clearly erroneous on this issue. While it is true that no dangling objects can be distinctly seen in the stop video, due to the angle of the sun, almost nothing can be seen inside the vehicle in the video; therefore, we cannot say that the stop video suggests the trial court was clearly erroneous. When the Trooper initially stopped the vehicle he told both Neff and Wilson the reason for the stop was in part because of dangling objects in the back window. Neither Neff nor Wilson challenged the officer's statement of the existence of the objects at the time of the stop. In addition, the trial court had the opportunity to evaluate Trooper Mechaley's testimony, and it chose to believe his version of events. As the Supreme Court has stated:

> [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not

internally inconsistent, can virtually never be clear error."

*Anderson v. City of Bessemer City,* N.C., 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); *see State v. Zachodni,* 466 N.W.2d 624, 628 (S.D.1991) (recognizing that on issues of credibility, a trial court "was in the position to observe the witness testifying, and we give due regard to its superior position to judge credibility."); *see also Welerford,* 356 F.3d at 936 (utilizing the clearly erroneous standard when reviewing a district court's decision to credit a trooper's version of a traffic stop). We have no reason to believe that Mechaley lied when he said he stopped the vehicle because it had dangling objects. Nor has Wilson pointed to some extrinsic evidence to contradict Mechaley's testimony. In the absence of such a showing, we must conclude the trial court's determination on this issue was not clearly erroneous. Because the trial court was not clearly erroneous in finding that there were dangling objects in the vehicle, the violation of SDCL 32–15–6 provided the trooper with reasonable suspicion to initiate a traffic stop. *See State v. Chavez,* 2003 SD 93, 668 N.W.2d 89; *Hirning,* 1999 SD 53, 592 N.W.2d 600; *State v. Dreps,* 1996 SD 142, 558 N.W.2d 339; *State v. Shearer,* 1996 SD 52, 548 N.W.2d 792; *State v. Ramirez,* 535 N.W.2d 847 (S.D.1995); *Krebs,* 504 N.W.2d 580.[1]

**[¶ 17.] 2. Where an officer tells a driver at the beginning of a traffic stop that he will "get you on down the road" and then detains the driver after becoming suspicious of drug use, is the Fourth Amendment's prohibition against unreasonable searches and seizures violated.**

[¶ 18.] The dangling objects in the vehicle provided Trooper Mechaley with reasonable suspicion to stop the vehicle. Once he stopped the vehicle, Mechaley was entitled "to conduct an investigation reasonably related in scope to the traffic violation, including the request for a driver's license, registration, proof of insurance and even a computer check for outstanding warrants." *State v. Kenyon,* 2002 SD 111, ¶ 16, 651 N.W.2d 269, 274. Wilson contends, however, that when the trooper said he would issue Neff a warning ticket and then "get you on down the road," he was not entitled to any subsequent investigation under our holding in *Ballard,* 2000 SD 134, ¶ 17, 617 N.W.2d at 842 (citing *United States v. $404,905 in U.S. Currency,* 182 F.3d 643, 648 (8th Cir. 1999)).

[¶ 19.] In *Ballard,* a deputy sheriff observed a vehicle drive on the shoulder of a road and then cross the center line. Suspecting that the driver of the vehicle was

---

1. Wilson does not contest the fact that the vehicle in which he was riding crossed the fog line. Rather, Wilson contends it was not a violation of South Dakota law when the vehicle crossed the fog line, and, therefore, the swerve did not provide the trooper with reasonable suspicion that supported a traffic stop. The trial court found that the swerve violated SDCL 32–26–1. The text of SDCL 32–26–1 provides as follows:

    Upon all highways of sufficient width, except upon one-way streets, the driver of a vehicle shall drive the same upon the right half of the highway and shall drive a slow-moving vehicle as closely as possible to the right-hand edge or curb of such highway, unless it is impracticable to travel on such side of the highway and except when overtaking and passing another vehicle subject to the limitations applicable in overtaking and passing set forth in §§ 32–26–26 to 32–26–39, inclusive. A violation of this section is a Class 2 misdemeanor.

    Wilson argues that nothing in the statute prohibits a vehicle from crossing the fog line to initiate a traffic stop. As we have already found the dangling object to be a legal basis for the stop of the vehicle, we need not address this alternative argument.

intoxicated, the deputy stopped the vehicle. Once stopped, the driver of the vehicle, Ballard, explained that she had swerved because she was looking for something in her purse. At this time, the deputy did not smell any alcohol in the vehicle nor did he have any reason to suspect contraband in the car. The deputy then asked Ballard to accompany him to his patrol car, where he proceeded to run a license check and write up a warning ticket. While sitting in the patrol car, the deputy noticed that Ballard appeared to be "very fidgety" and her pupils looked constricted, behaviors that often indicated methamphetamine use in the deputy's experience. *Ballard, Id.*, ¶ 4. Nevertheless, the deputy issued the warning ticket to Ballard and told her she was "free to leave." *Id.* After telling Ballard she was "free to leave," the deputy asked if he could search her vehicle because he was suspicious of drug use. *Id.* Ballard refused the search. In response, the deputy detained the vehicle until a drug detection dog arrived. The dog alerted to the vehicle and a subsequent search of the vehicle yielded the presence of marijuana and drug paraphernalia. The officers then arrested Ballard and the two passengers in the vehicle.

[¶ 20.] The trial court denied Ballard's motion to suppress, and she was subsequently found guilty of possession of marijuana and drug paraphernalia after a bench trial. We reversed the trial court's denial of Ballard's motion to suppress because the deputy's "detention of Ballard after telling her she was free to leave was impermissible under the Fourth Amendment." *Id.*, ¶ 15. While we recognized Ballard's actions afforded the deputy with reasonable suspicion to justify the initial traffic stop, once the traffic investigation was completed, the deputy was obligated to allow the driver to proceed without further detention unless he had additional reasonable suspicion to extend the stop. *Id.*, ¶ 13. In addition, we held that "[a] refusal to give consent to search after the motorist is free to leave cannot give rise, of itself, to further suspicion and justification for a search." *Id.*, ¶ 17. Much of our opinion in *Ballard* was due to our reluctance to approve the manner in which the search was carried out:

> [W]e are concerned with the dubious message we send to law enforcement officers and the public if we validate a procedure allowing officers to falsely tell traffic offenders they are free to go, only for the purpose of eliciting their uncoerced agreement to search their automobiles.

*Id.*

[¶ 21.] We believe the present case is clearly distinguishable from the situation in *Ballard*. In *Ballard*, the officer specifically told the driver that she was "free to go" *after* he had completed the permissible license check and observed the suspicious behavior. *Id.*, ¶ 15. Ballard's subsequent detention was impermissible because the officer did not gain a reasonable suspicion after telling Ballard that she was free to go. *Id.* In this case, Mechaley told Neff as a preliminary matter that he intended to issue a warning citation to Neff and then "get you on down the road." Unlike Ballard, Neff was not advised that he was presently free to go. Furthermore, it is clear the trooper told Neff he would "get you on down the road" *before* completing a computerized license check and *before* he became suspicious of drug use. An officer telling a driver at the beginning of a stop that he will issue a warning ticket and then "get [him] on down the road" is simply not the same as giving a driver a ticket and then telling him he is free to leave. Thus, the issue turns on whether or not Mechaley had a reasonable suspicion to justify extending his detention of the Neff vehicle

beyond his investigation for the original traffic stop. *Id.,* ¶ 13. *See State v. Vento,* 1999 SD 158, ¶ 8, 604 N.W.2d 468, 470.

[¶ 22.] In order to extend a traffic stop, "[w]e require 'a specific and articulable suspicion of a violation.'" *Ballard,* 2000 SD 134, ¶ 13, 617 N.W.2d at 841 (quoting *Spenner v. City of Sioux Falls,* 1998 SD 56, ¶ 14, 580 N.W.2d 606, 610) (citation omitted). Here, Mechaley became suspicious of drug use as a result of his fifteen minute conversation with Neff and the constricted appearance of Neff's pupils. In determining whether a law enforcement officer permissibly extends a traffic stop, we look at the evidence "as a totality and in light of the officer's experience." *Id.* (quoting *United States v. Bloomfield,* 40 F.3d 910, 915 (8thCir.1994); *see Pringle,* 540 U.S. at ——, 124 S.Ct. at 800, 157 L.Ed.2d at ——). Under this standard, we conclude Trooper Mechaley had a reasonable suspicion of drug use justifying his extended stop of Neff's vehicle. Because Mechaley developed his reasonable suspicion of drug use after telling Neff he would "get you on down the road," the extended detention did not violate our holding in *Ballard.*

[¶ 23.]  **3. May a passenger in a vehicle challenge the validity of the driver's consent to a vehicle search.**

[¶ 24.] Wilson also challenges whether Neff's consent to Mechaley's request for a vehicle search was voluntarily given. The trial court, however, concluded Wilson lacked standing to challenge the validity of Neff's consent. Because we agree that Wilson does not have standing to challenge the nature of Neff's consent, we do not specifically address whether or not Neff's consent was voluntary.

[¶ 25.] As we have previously recognized, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Krebs,* 504 N.W.2d at 586 (quoting *Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 425, 58 L.Ed.2d 387, 394 (1978) (citation omitted)). A passenger may challenge the consent to a vehicle search if he has "a legitimate expectation of privacy in the area searched." *Rakas,* 439 U.S. at 148, 99 S.Ct. at 433, 58 L.Ed.2d at 404; *see State v. Caffrey,* 332 N.W.2d 269, 274 (S.D.1983). Thus, in order to challenge the consent to the search of Neff's vehicle, Wilson had the burden of showing that he had a legitimate expectation of privacy in Neff's vehicle. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633, 641 (1980).

[¶ 26.] In *Krebs,* we utilized the following factors in determining whether a passenger had a legitimate expectation of privacy in a vehicle:

> [A] legitimate presence in the area searched, possession or ownership of the area searched or the property seized, prior use of the area searched or · the property seized, ability to control or exclude others' use of the property, and a subjective expectation of privacy.

504 N.W.2d at 587 (citing *United States v. Carter,* 854 F.2d 1102, 1105 (8thCir.1988)); *see LAFAVE, supra* at 170. We analyze these factors under the totality of the circumstances. *Id.* (citing *United States v. Aguirre,* 839 F.2d 854, 856–57 (1stCir.1988)).

[¶ 27.] Wilson, as a passenger, bore the burden of proving he had a legitimate expectation of privacy. *Id.,* at 586 (citing *Rawlings,* 448 U.S. at 105, 100 S.Ct. at 2562, 65 L.Ed.2d at 641).[2] After consid-

---

**2.** Although Wilson bore the burden of proof at the suppression hearing, he did not testify even though he was present. He further called no witnesses on his behalf. His coun-

ering all of the factors we conclude that Wilson was merely a passenger without a legitimate expectation of privacy in Neff's vehicle.

[¶ 28.] Wilson neither owned the vehicle nor operated it at the time it was stopped for the traffic violations. Wilson did not control the keys to the vehicle or the registration. When the officer announced he intended to search the vehicle, Wilson, rather than claiming an expectation of privacy in any of its contents, denied "knowing of any knowledge of anything in the car." However, after further conversation with the officer, and prior to any search, Wilson conceded there were drugs in the vehicle, although he did not specify who owned them. After the officer made the initial discovery of a needle cap, Wilson showed the officer the location of further drug paraphernalia and drugs in the car.

[¶ 29.] Wilson contends he had a legitimate expectation of privacy because he owned the sunglass case in which the drugs were found. Wilson also points out that the case was found underneath the seat in which he had been riding. Although it is a factor that we will consider, "[o]wnership of property seized is not determinative of a legitimate expectation of privacy." *Id.*, 587 (citing *Rawlings*, 448 U.S. at 105, 100 S.Ct. at 2562, 65 L.Ed.2d at 642). In addition, the fact that the evidence was discovered under Wilson's seat is clearly not dispositive. *See United States v. Elwood*, 993 F.2d 1146, 1151–52 (5thCir.1993) (truck passenger without standing to object to search of the area under passenger seat); *Rakas*, 439 U.S. at 148, 99 S.Ct. at 433, 58 L.Ed.2d at 404; *see also LAFAVE, supra* at 174 ("Given the fact that in *Rakas* a justified expectation of privacy is deemed to be lacking . . . as to

an area closer to the passengers under the seat, it is doubtful there is such an expectation anywhere in the vehicle.") (citations omitted).

[¶ 30.] The weight of Fourth Amendment authority strongly suggests Wilson may not challenge the search in this case, and he concedes as much when he argues in his reply brief that "states may adopt a standard for vehicle searches which affords greater protection to Constitutional rights than the United States Constitution." Wilson points us to the case of *Nebraska v. Stott*, 503 N.W.2d 822, 243 Neb. 967 (1993) for the proposition such passenger standing should be automatically recognized under the South Dakota Constitution. Wilson declares that such recognition would avoid "unjust results." Nebraska has apparently opted for a rule of automatic standing granted to all passengers in a motor vehicle:

> [A]n occupant of an automobile has a legitimate expectation to be free of unreasonable governmental intrusion so as to give the occupant standing to challenge the stop as violative of his or her Fourth Amendment rights.

503 N.W.2d at 828 (quoting *State v. Chavez*, 240 Neb. 538, 543, 483 N.W.2d 122, 125 (1992)).

[¶ 31.] Such a blanket rule seems to us to be at odds with the more appropriate "legitimate expectation of privacy in an area search" doctrine of *Krebs* and *Rakas*. We cannot interpret the federal or state constitution to grant a blanket extension of standing to all who occupy a vehicle for whatever reason, be they invited guests, hitchhikers, cash paying patrons in a commercial vehicle, stowaways, or even car thieves.

---

sel did cross-examine the sole witness, Trooper Mechaley. In its Findings of Fact and

Conclusions of Law, the trial court found the Trooper to be "credible."

[¶ 32.] Here, as in *Krebs,* Wilson cannot claim any possessory interest in the vehicle nor could he exclude others from the area searched. 504 N.W.2d at 587. In addition, Wilson has not established any prior use of the vehicle. Viewed under the totality of the circumstances, Wilson did not have a legitimate expectation of privacy in the area searched, and, therefore, he does not have standing to contest the nature of the driver's consent. *Id.*

[¶ 33.] Affirmed.

[¶ 34.] KONENKAMP and ZINTER, Justices, concur.

[¶ 35.] SABERS and MEIERHENRY, Justices, dissent.

SABERS, Justice (dissenting).

[¶ 36.] I dissent. In making the blanket determination that Wilson lacked standing to challenge this search or seizure, the majority opinion improperly removes whatever Fourth Amendment protection remained after this Court's decisions in cases such as *State v. Chavez,* 2003 SD 93, 668 N.W.2d 89, and *State v. De La Rosa,* 2003 SD 18, 657 N.W.2d 683. The majority opinion engages in analysis which serves little purpose but to once again put the goal of drug interdiction above the protections of our Federal and State Constitutions.

[¶ 37.] The question is not whether a passenger has "standing" to object to an illegal search, but whether Wilson had a legitimate expectation of privacy in the area searched and the property seized. In *Rakas,* the Court rejected the standing analysis of *Jones* and held instead that the question presented was to be considered under the rubric of the Fourth Amendment reasonable expectation analysis. In other words, the Court must consider whether the "proponent of the motion to suppress has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." *Rakas,* 439 U.S. at 133, 99 S.Ct. at 425, 58 L.Ed.2d at 394. I submit that Wilson's Fourth Amendment rights were infringed by both the illegal search under his seat and the seizure of his sunglass' case.

[¶ 38.] The majority opinion correctly lists the factors the majority adopted in *Krebs,* but does not properly apply the factors to the facts. Among the considerations for this Court in determining whether Wilson had a legitimate expectation of privacy are whether he had:

1) a legitimate presence in the area searched;

2) possession or ownership of the area searched;

3) possession or ownership of the property seized;

4) prior use of the area searched;

5) prior use of the property seized;

6) ability to control or exclude others' use of the property;

7) a subjective expectation of privacy.

The majority opinion provides mere lip service to these factors. Specifically, it ignores the facts that: 1) Wilson was legitimately in the vehicle; 2) he owned the property seized, asserted ownership of that property to the officer, and it was within an area under his exclusive control while he was riding in the car; 3) he had prior use of the property seized; 4) by simply locking his door or refusing to move his body, he had the ability to control or exclude others' use of the sunglass' case and the seat in which he sat; and 5) as discussed below, it must be conceded that all passengers in a vehicle have some subjective expectation of privacy in their belongings, especially if they have placed them under the seat, out of public view.

[¶ 39.] Most adults in South Dakota either ride in or drive a private vehicle on a

daily basis. As the Supreme Court noted in *Delaware v. Prouse*, "[m]any people spend more hours each day traveling in cars than walking on the streets." 440 U.S. 648, 662, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660, 663 (1979). The government actively encourages people to car pool, and many people commute distances up to an hour to work every day. Passengers and drivers carry briefcases, book bags, handbags, sunglass' cases and other objects with them in the car wherever they go. Given the relatively small size of our state, more citizens choose to drive the distance between cities rather than fly when they go visiting or on vacations away from home. In all of these instances, people carry items with them that society considers private; everything from personal hygiene products to private papers. By its broad ruling and generalized reasoning, the majority opinion equates the average passenger's privacy interests with "all who occupy a vehicle for whatever reason ... even car thieves." Majority opinion ¶ 31.

[¶ 40.] There can be no question that the average person believes they have more privacy in an automobile than they would walking down the street. This is especially so when they take pains to conceal objects away from the public view, e.g. in a glove compartment or under their seat. Certainly the majority opinion would acknowledge that a person walking down the street holding a handbag has a reasonable expectation of privacy in that handbag. Today, the majority opinion would hold that if that person got into a car and put the handbag on the floor between her feet, she'd have little or no expectation of privacy in the handbag. If the person placed the handbag under her seat, she would unquestionably have no legitimate expectation of privacy under this decision.

[¶ 41.] The only difference between these two victims of police overreaching (the pedestrian and the passenger) is that one of them got into a vehicle. The majority opinion glosses over the key factors in *Krebs*, which indicate that a person can establish an expectation of privacy in the property that was seized. Based on the totality of circumstances, Wilson established that interest, and it should be protected. I urge the members of the Court to properly analyze the totality of the circumstances and refuse to adopt the holding of the majority opinion. However, if this is to be the law of this state, all occupants of vehicles in South Dakota should be bluntly warned that they lose their basic Fourth Amendment protections the moment they get into a vehicle. The consequences of this opinion will be far-reaching.[3]

---

3. The following scenarios run the spectrum from plausible to possible consequences of this decision:

 1. The majority opinion opens the door to flagrant police abuses against innocent citizens. Now, whenever police lack probable cause to search the belongings or person of one suspected of a crime, police need only wait until the person is a passenger in someone else's car. The officer may simply violate the Fourth Amendment rights of the innocent driver to initiate a search of the belongings of the passenger.
 2. The majority opinion ignores the legitimate expectations of the average vehicle passenger. The reason for this seems simple: the defendant was caught with drugs. In the interest of drug interdiction, this Court's jurisprudence allows substantial intrusions on the privacy rights of South Dakota's citizens. One need only consider an alternative factual scenario to recognize the danger of the majority opinion's conclusions. For example, imagine if an officer were to pull over two attorneys based on his visually unsupported belief that there was an object dangling from the rear view mirror. As the stop proceeds, the officer begins to believe

[¶ 42.] Under this majority opinion, people in South Dakota have little or no Fourth Amendment protection once they enter a vehicle. This is clearly demonstrated in the recent Fourth Amendment cases coming from this Court.

[¶ 43.] According to our Fourth Amendment jurisprudence in the last several years and including this case, it is now acceptable for a police officer to stop a vehicle on the flimsiest pretense. For example, in the instant case, the police officer is presumed to have had reasonable suspicion to pull the vehicle over based on his sighting of a "dangling object" from the rear view mirror. Viewing the videotape, one can see the shadow of each occupant of the car and the shadow of the rear view mirror, but, in defiance of logic, one cannot see the dangling object or the shadow of the dangling object. Once the officer has the vehicle stopped, there seems no limit on the officer's ability to search the vehicle. Although the officer is supposed to have probable cause to search or the driver's consent, this is a legal fantasy. If the driver refuses to consent, as in this case, the officer merely threatens to bring a drug dog to the scene and holds the occupants there as long as necessary to bring a dog, or the officer makes clear that refusal to consent is a temporary bump in the road that can easily be rectified by making an arrest, or, as in this case, the officer coerces consent from the driver. This case goes even further in eroding individuals' protection from government intrusion, holding that by placing oneself in the passenger seat of a vehicle, one loses any expectation of privacy.

[¶ 44.] It is often said that bad facts make bad law. I urge the Court not to allow the bad facts of this case to lead to bad law. Obviously, Wilson was in possession and under the influence of drugs. The State's interest in drug interdiction is compelling, and suppressing drug evidence is difficult for courts and law enforcement. However, the Fourth Amendment does *not* provide:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated, *except in drug cases.*

[¶ 45.] MEIERHENRY, Justice, joins this dissent.

that the vehicle contains contraband. He asks the driver for permission to search the car, the driver declines to consent, but the officer searches the car in spite of the driver's objection. Under the passenger's seat is a file containing the attorney's confidential work product from a client's case. The officer goes through the entire file in search of contraband. Based on the majority opinion's determination, the passenger has no standing to object to the search and a subsequent § 1983 action would be too little too late to protect constitutional rights.

3. Another scenario is more disturbing because it may happen more often. The driver of the stopped vehicle initially refuses to give consent, but the officer informs the driver that if he is more "helpful" things will "go easier" for him. The driver, knowing that his contraband is under the passenger's seat, consents to the search after insisting to the officer that he has no knowledge of any contraband in the car. Given that the contraband is within the reach and therefore under the control of the passenger, the officer arrests the unwitting passenger for possession of the contraband. The passenger has no standing to challenge the legality of the search, despite the fact that he has essentially been "set up" by the driver and officer.