1999 SD 19

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**James SLEEP, Defendant and Appellant.**

**No. 20472.**

Supreme Court of South Dakota.

Considered on Briefs Dec. 3, 1998.

Reassigned Dec. 31, 1998.

Decided Feb. 10, 1999.

---

Mark Barnett, Attorney General, Grant Gormley, Assistant Attorney General, Pierre, South Dakota, for plaintiff and appellee.

Bruce Ellison, Rapid City, South Dakota, for defendant and appellant.

KONENKAMP, Justice (on reassignment).

[¶ 1.] In this appeal, we must decide if once a suspect surrenders a weapon to investigating officers, may the officers continue a patdown search when they still observe suspicious bulges which might be concealed weapons. The trial court upheld the search which ultimately revealed illegal drugs. We affirm because if officers reasonably suspect more weapons may be concealed, they may continue their patdown search.

### Facts

[¶ 2.] On August 7, 1997 at approximately 3:30 am, Troopers Deuter and Lentz were

patrolling on Highway 34 east of Sturgis, South Dakota, when they received a radio message from Trooper Noteboom warning of a white Toyota pickup speeding and driving erratically toward Sturgis. Noteboom was engaged in another traffic stop and was unable to pursue the truck. He did not report a license number, a description of the driver or relate whether any passengers were aboard.

[¶ 3.] Before long, Troopers Deuter and Lentz spotted a white Toyota pickup coming toward them. As they turned and followed it, the truck traveled in the inner lane of the four-lane highway. Although it never crossed into the oncoming lanes, at one point the truck straddled the line between the inner and outer lanes for the equivalent of one block. While the officers followed, the pickup swerved to the fog line, then to the center of the lane and back to the fog line. After observing this, the officers stopped the truck on suspicion of driving under the influence. When he approached the vehicle, Trooper Deuter asked the driver, James Dale Sleep, to produce his license, registration, and proof of insurance. Deuter could detect no odor of alcohol or marijuana. He asked Sleep to accompany him to his patrol car and Sleep followed without swaying or staggering. The officer delineated a fine line between being belligerent and mouthy, but assessed Sleep's deportment as definitely mouthy.

[¶ 4.] As they walked toward the patrol car, Deuter saw a bulge in Sleep's right front pants pocket. When asked if he had any weapons, Sleep replied that he had a knife. Deuter requested it and Sleep handed it to him. Deuter then asked if he had any other weapons, but Sleep denied it. Deuter saw two bulges in Sleep's left front pants pocket and asked him what they were. Sleep did not respond. The officer patted the pocket and determined that the bulges "could possibly be pocket knives." Again, Deuter asked what was in his pocket. Sleep "reached in and he fished around in his pocket for a little bit and he came out and he held out his hand

with nothing in it." The bulges were still there. Deuter had Sleep empty that pocket. Sleep removed two cigarette lighters, a "wad" of cash, a small drug sniffing device known as a "bullet," and a sticker that read, "My other bike is up my nose." Trooper Lentz handcuffed Sleep and the officers then searched his clothing. Lentz found a baggie containing methamphetamine and a snort tube in Sleep's left pocket.[1]

[¶ 5.] Sleep moved to suppress the evidence taken during the search, asserting that (1) the traffic stop was merely pretextual; (2) he was unlawfully detained absent any reasonable circumstances to show the commission of an offense; (3) the officers performed a patdown search without an indication of a present danger to the safety of the officers; (4) the search was performed without consent or a warrant; and (5) the seizure of the methamphetamine violated his state and federal constitutional rights. His motion was denied and he was convicted in a court trial. He received a suspended imposition of sentence. He now appeals claiming the trial court erred in denying his motion to suppress.

## Standard of Review

[¶ 6.] We review a court's fact findings under the clearly erroneous standard. See *State v. Almond,* 511 N.W.2d 572, 573–74 (S.D.1994). Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo. *Spenner v. City of Sioux Falls,* 1998 SD 56, ¶ 13, 580 N.W.2d 606, 610. Whether a law enforcement officer had a lawful basis to conduct a warrantless search is reviewed as a question of law. *State v. Krebs,* 504 N.W.2d 580, 585 (S.D.1993) (citation omitted).

## Analysis and Decision

### 1. Investigatory Stop

[¶ 7.] Sleep first asserts that the officers lacked valid grounds to stop his vehicle—"the purported 'weaving' in the instant case did not provide probable cause of drunk

---

1. Some of the circuit court's fact findings are out of sequence and inaccurate, but as described here, Trooper Deuter's testimony on the events surrounding the patdown search stands uncontradicted.

driving nor justify the DUI investigatory stop made in this case." The Fourth Amendment of the United States Constitution and Article VI, § 11 of the South Dakota Constitution protect an individual's right to be free from unreasonable searches and seizures. The stop of an automobile is a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). To justify detaining a person, a law enforcement officer must have reasonable suspicion supported by articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); *see State v. Anderson*, 331 N.W.2d 568, 570 (S.D.1983) (citation omitted). Reasonable suspicion to stop a vehicle is not equivalent to probable cause needed for an arrest or a search warrant. *State v. Lownes*, 499 N.W.2d 896, 898 (S.D.1993). The factual basis needed to support a traffic stop is minimal. Police are not authorized to pull over motorists on a hunch or idle curiosity, but a stop is lawful under *Terry* if officers have "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion[.]'" *Anderson*, 331 N.W.2d at 570 (alterations in original) (quoting *People v. Ingle*, 36 N.Y.2d 413, 420, 369 N.Y.S.2d 67, 74, 330 N.E.2d 39, 44 (1975) (citation omitted)).[2]

 [¶ 8.] Following these standards, we conclude that the officers had an articulable suspicion to justify stopping Sleep's vehicle to further investigate a possible DUI offense. Just before spotting his Toyota pickup, the officers received a radio message from Trooper Noteboom about a truck similar to Sleep's Toyota. Noteboom communicated his observations about how the vehicle was driving. Although Noteboom was unable to report a license plate number or a description of the driver, his message alerted other law enforcement officers to be on the watch for a white Toyota pickup driving erratically. *Terry* stops are permissible even when the information supplying the reasonable suspicion comes from another person rather than an officer's personal observation. *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972). Yet Trooper Lentz and Deuter independently observed Sleep's truck weaving and straddling the line between two lanes. They could not conclude with certainty that the Toyota they spotted was the one Noteboom described. Nonetheless, a definite traffic violation was not necessary before stopping the truck. Based on Noteboom's radio alert and their own observations, they had a reasonable and articulable suspicion, and that is all the law requires.

## 2. Patdown Search

 [¶ 9.] Sleep next argues that the patdown search for weapons was unreasonable. Fundamentally, whether a search is reasonable depends on balancing the public's interest in preventing crime with the individual's right to be free from arbitrary and unwarranted governmental intrusions into personal privacy. *State v. Ashbrook*, 1998 SD 115, ¶ 8, 586 N.W.2d 503, 506–07; *see also Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977); *Terry*, 392 U.S. at 20–27, 88 S.Ct. at 1879–83. The United States Supreme Court decided in *Terry* that protective patdown searches occurring as part of investigatory stops are justified when officers have grounds to believe that their safety or the safety of others may be compromised by concealed weapons. *Terry*, 392 U.S. at 27, 88

---

**2.** The trial court found that probable cause existed to stop Sleep's vehicle. We need not agree in order to affirm because reasonable suspicion, which is minimally required, existed to validate an investigative stop. Of course, a traffic stop can be justified on probable cause. *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."), *appeal after remand*, 111 F.3d 956 (D.C.Cir.

1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1059, 140 L.Ed.2d 120 (1998). On the other hand, a traffic stop is lawful if officers have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Johnson*, 64 F.3d 1120, 1124 (8th Cir.1995) (quoting *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884), *cert. denied*, 516 U.S. 1139, 116 S.Ct. 971, 133 L.Ed.2d 891 (1996). As a practical matter, unlike most traffic violations, it will be a rare case when an officer will identify a definite DUI offense before stopping the vehicle and observing the driver.

S.Ct. at 1883. With potentially armed suspects, officers have no less reason for self-protection during an investigatory stop than they might have during an arrest. *Adams*, 407 U.S. at 146, 92 S.Ct. at 1923. At the inception of the search,

> [t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.... And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Terry*, 392 U.S. at 27, 88 S.Ct. at 1883 (internal citations omitted). The Court concluded that a limited protective search of this type is not contrived to

> discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable.... So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.

*Adams*, 407 U.S. at 146, 92 S.Ct. at 1923 (internal footnote omitted) (citing *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884).

 [¶ 10.] As we stated above, the stop here was valid and Sleep was lawfully directed to the patrol car. When asked, Sleep admitted he was carrying a weapon and surrendered a knife. Because he handed over a single weapon, were the officers bound to conclude that this was the only one

he had? Although Sleep denied having any others, the bulges, which were similar to the one which actually was a weapon, could have been more knives or another type of weapon. Police need not be certain that a subject is armed; they must only have a reasonable belief that the individual is carrying a weapon and is potentially dangerous. *Id.* The troopers were justified in believing Sleep might be concealing additional weapons, and therefore, it was reasonable for them to conduct the patdown search to prevent injury.[3] Once the "bullet" was observed, it being an item of drug paraphernalia, the *Terry* search ripened into probable cause for a full search of Sleep's person.

 [¶ 11.] The seizure of the drugs in this case is authorized by the United States Supreme Court decision in *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). There, the Court held that "police officers may seize nonthreatening contraband detected during a protective patdown search," provided the search does not exceed what is minimally necessary to ascertain whether the individual is concealing weapons. *Id.* at 373–74, 113 S.Ct. at 2136. In *Dickerson*, Minneapolis police officers stopped an individual they observed leaving a known "crack house." *Id.* at 368, 113 S.Ct. at 2133. The officers ordered the defendant to submit to a patdown search. *Id.* at 369, 113 S.Ct. at 2133. Although the search exposed no weapons, the searching officer felt a lump in the defendant's jacket pocket. *Id.* The officer manipulated the item in the pocket by feeling it with his fingers through the defendant's jacket. *Id.* Ascertaining that it could be cocaine, the officer reached into the pocket and retrieved the item which was, indeed, cocaine wrapped in cellophane. *Id.*

---

**3.** Sleep contends that the stop and search here, conducted during the annual Sturgis Motorcycle Rally, was pretextual, done only to seize illegal drugs. Under *Whren*, an officer's subjective intentions will not make continued detention illegal, if it is justified by the circumstances viewed objectively. 517 U.S. at 812–13, 116 S.Ct. at 1774. There, the Court unanimously stated:

> We flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification. In *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d

427 (1973), we held that a traffic-violation arrest (of the sort here) would not be rendered invalid by the fact that it was "a mere pretext for a narcotics search," *id.*, at 221, n. 1, 94 S.Ct., at 470, n. 1; and that a lawful post arrest search of the person would not be rendered invalid by the fact that it was not motivated by the officer-safety concern that justifies such searches, *see id.*, at 236, 94 S.Ct., at 477. *See also Gustafson v. Florida*, 414 U.S. 260, 266, 94 S.Ct. 488, 492, 38 L.Ed.2d 456 (1973). *Id.*

at 369, 113 S.Ct. at 2133–34. The Supreme Court held that the patdown search was lawful; however, the seizure of the cocaine when the officer knew it was not a weapon while it was still in the defendant's pocket exceeded the limits set forth by the *Terry* decision. *Id.* at 373, 379, 113 S.Ct. at 2136, 2139.

[¶ 12.] Here, unlike *Dickerson*, after Sleep surrendered a knife, the officers still had reason to believe the remaining bulges might be weapons, especially in light of the circumstances. They were justified in being suspicious of the bulges in Sleep's pockets, particularly after Sleep relinquished one weapon he was carrying, but was reluctant to disclose what the remaining bulges were. Under *Dickerson*, the patdown search was reasonable.

[¶ 13.] Affirmed.

[¶ 14.] MILLER, Chief Justice, and GILBERTSON, Justice, concur.

[¶ 15.] SABERS and AMUNDSON, Justices, concur in part and dissent in part.

SABERS, J. (concurring in part, dissenting in part).

[¶ 16.] I agree with the majority that the troopers had a reasonable and articulable suspicion to stop Sleep's vehicle. However, I respectfully dissent from the majority's conclusion that the patdown searches were reasonable.

[¶ 17.] Trooper Deuter violated Sleep's state and federal constitutional rights by performing a patdown search without a reasonable belief that he was armed and dangerous. Sleep's subsequent compliance with the instruction from Deuter to empty his pockets was not the product of free will, but done under the color of authority. Therefore, we should reverse and remand.

[¶ 18.] In *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889, 911 (1968), the United States Supreme Court held:

> [W]here a police officer observes unusual conduct which leads him *reasonably to conclude* in light of his experience that criminal activity may be afoot and *that the persons with whom he is dealing may be armed and presently dangerous,* where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

(Emphasis added). Under *Terry*, the scope of the search is narrow. *State v. Shearer*, 1996 SD 52, ¶ 18, 548 N.W.2d 792, 796. "It permits a reasonable search for weapons for the protection of the police officer 'where he has reason to believe that he is dealing with an armed and dangerous individual[.]' " *Id.* (alteration in original) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909).

[¶ 19.] The trial court's findings of fact provide:

> -14-
>
> Trooper Deuter asked the Defendant about the bulges in his left pocket.
>
> -15-
>
> The Defendant dug in his pocket and eventually came out with a device called a "bullet", used to stick drugs up a nose with a sticker on it that says, "My other bike is up my nose."
>
> -16-
>
> Trooper Deuter after stating that the Defendant would not show what was in his left pocket and suspicious about the Defendant being armed did [a] patdown [search of] his right pocket and Trooper Lentz did [a] patdown [search of] his left pocket.

[¶ 20.] Based on a review of the record, the court should find the findings of fact made by the trial court are clearly erroneous in part. The trial court fails to mention that the initial patdown search was conducted by Officer Deuter without consent prior to the removal of the "bullet" from Sleep's pocket. Trooper Deuter testified at the suppression hearing:

Q [State's Attorney]: And could you describe what happened after he stepped out of the vehicle.

A: I asked him to come back and have a seat in my patrol car, and as we entered the front right corner of my car I asked him if he had any weapons on him, having observed a bulge in his front right pocket.

Q: What did he tell you?

A: He told me he had a knife in his pocket.

Q: Would that cause you concern if a person was going into your vehicle?

A: Yes, ma'am, it would.

Q: What did you do based upon that information?

A: I asked him for that weapon, and I also asked him if he had any other weapons on him.

Q: What did he tell you?

A: He told me he did not, however I had observed bulges in his left pocket also, and I asked what those were, he refrained comment, *I patted,* I felt two bulges that could possibly be pocket knives, I asked him to remove them so I could see what they were.

Q: And could you describe how that occurred.

A: The—I asked him what was in his pocket, and he reached in and he fished around in his pocket for a little bit and then he came out and he held out his hand with nothing in it.

Q: Were the bulges still in his left pocket?

A: Yes, ma'am, they were.

Q: Based upon that what did you do?

A: It made me really suspicious, I told him, "I know better than that, I know there is something in that pocket, would you please remove everything from that pocket now and hand it to me." He then reached in his pocket and you could see him sorting the stuff down in his pocket, when he came out with his hand the next time he had two cigarette lighters, a wad of cash, there was a—what we call a bullet, a little drug sniffing device, and a sticker that says, "My other bike is up my nose."

. . . .

Q: Regarding—well, what happened after that?

A: I told my partner, Trooper Lentz, to place handcuffs on Mr. Sleep, we then cuffed him up and I started patting down his right pocket and his right side and Trooper Lentz patted the left side at the same time.

(Emphasis added).

[¶ 21.] Although Trooper Deuter may have been suspicious about the content of Sleep's pockets, his testimony at the suppression hearing does not support the finding by the trial court that Trooper Deuter believed Sleep was armed and dangerous. On direct examination, Deuter only agreed with a general statement made by the State's Attorney that he would be concerned about someone entering his patrol car with a knife. He did not testify to any specific facts which caused him to believe Sleep was armed and presented a danger to his safety. In fact, on cross-examination, he testified that Sleep never made any threats:

Q: When he got out of the vehicle his hands were empty?

A: Yes, sir.

Q: He made no aggressive moves toward you?

A: Not at that point, no.

Q: In fact, there is nothing in your report about him ever making any aggressive moves towards you, is there?

A: No, sir, I did not allow the opportunity.

Q: Okay. Did he threaten you at all?

A: No, he did not, at that time.

Q: Do you have anywhere in your report that Mr. Sleep made any threats towards you?

A: No, sir.

[¶ 22.] The United States Supreme Court stated in *Sibron v. New York,* 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917, 935 (1968):

The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a

citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. *In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.* (Emphasis added). When Sleep exited his pickup and began walking to the patrol car, his hands were visible and empty. He admitted to possession of a knife when asked whether he had any weapons. He gave the knife to Deuter when he requested it. Sleep made no verbal or physical threats toward either trooper. "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given not to his inchoate and unparticularized suspicion or 'hunch,' but to the *specific reasonable inferences which he is entitled to draw from the facts in light of his experience.*" *Shearer,* 1996 SD 52 at ¶ 20, 548 N.W.2d at 796 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909 (emphasis added)). Deuter did not make any specific, reasonable observations to support a belief that Sleep was armed and dangerous. Therefore, the trial court erred and the initial patdown search of Sleep violated his constitutional right to be free from unreasonable search and seizure.

[¶ 23.] Following the initial patdown search, Trooper Deuter told Sleep to empty his pockets. Sleep was not free to leave and he did not consent to the search. See *State v. Almond,* 511 N.W.2d 572, 576 (S.D.1994) (stating "when an individual is under an illegal detention at the time when any (alleged) consent to search is given, that consent is 'tainted by the illegality and [is] ineffective to justify the search.' "). Then the "bullet" was discovered. The State concedes in its brief that "the search of Defendant's pocket (performed by Defendant himself) is not a consent search at all, but rather a limited search of a person believed to be armed and dangerous." For the reasons discussed above, Deuter did not have specific, reasonable observations to support a belief that Sleep was armed and dangerous. Sleep did not voluntarily retrieve the "bullet" from his pants pocket; instead he acted under a show of authority by Deuter. *Almond,* 511 N.W.2d at 574–75. Therefore, the search and seizure

of the "bullet" violated Sleep's state and federal constitutional rights.

[¶ 24.] Sleep was handcuffed after the "bullet" was found. The troopers conducted a second patdown search. A baggie of methamphetamine and a snort tube were found. The majority states that this was a valid search incident to lawful arrest. However, the basis for the arrest was the illegally seized "bullet." Therefore, the arrest and subsequent seizure of the methamphetamine and snort tube were in violation of Sleep's state and federal constitutional rights.

[¶ 25.] "Under the exclusionary rule, illegally obtained evidence must be suppressed." *Shearer,* 1996 SD 52 at ¶ 21, 548 N.W.2d at 796 (citing *State v. McCreary,* 82 S.D. 111, 125, 142 N.W.2d 240, 247 (1966) (citing *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961))). "The rationale for this rule is to deter police from violating constitutional protections." *Shearer,* 1996 SD 52 at ¶ 21, 548 N.W.2d at 796 (citing *State v. Saiz,* 427 N.W.2d 825, 826 (S.D. 1988)). Trooper Deuter conducted a search of Sleep without the legal authority to do so. The illegal search lead to the discovery and seizure of the "bullet." The subsequent search and seizure of the methamphetamine and snort tube was the product of the illegal search and seizure. "Fourth Amendment protections to our citizens cannot be sacrificed." *Shearer,* 1996 SD 52 at ¶ 23, 548 N.W.2d at 797. Therefore, the trial court erred in denying the motion to suppress the "bullet," snort tube, and methamphetamine.

[¶ 26.] We should reverse and remand for a fair trial.

[¶ 27.] Justice Amundson joins this special writing.