2005 SD 47

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Carl Olin LOCKSTEDT, Defendant and Appellant.**

No. 23289.

Supreme Court of South Dakota.

Considered on Briefs Jan. 10, 2005.

Decided April 13, 2005.

Lawrence E. Long, Attorney General, John M. Strohman, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Elizabeth M. Frederick, Rapid City, South Dakota, Attorney for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] In this automobile search case, the trial court denied a defense motion to suppress evidence seized after a drug detection dog purportedly indicated the presence of drugs in a car in which defendant was a passenger. Defendant questions whether the drug dog truly signaled the odor of an illegal substance. Because the record viewed in a light most favorable to the findings supports the circuit court's conclusions, we affirm.

### Background

[¶ 2.] On, October 21, 2002, South Dakota Highway Patrol Trooper Brian Swets was patrolling on Interstate 90. With him was his drug detection dog, Crockett. Shortly after 9:00 a.m., the trooper was near Piedmont, South Dakota, traveling eastbound toward Rapid City. He observed a red-colored Chrysler automobile bearing Texas license plates. At the time, the trooper was traveling 75 m.p.h. and was about to pass the Chrysler, which was moving at 70 m.p.h.

[¶ 3.] As the trooper pulled alongside the vehicle, he noticed that there were two occupants. The driver, Billy Carl Kinnamon, was leaning his head against the side window. To the trooper, he looked fatigued. The other passenger was defendant, Carl Olin Lockstedt. Neither occupant made any eye contact with the officer as he was moving past the vehicle. Trooper Swets slowed his car and pulled behind the Chrysler. Upon calling in the vehicle's license plate number, he learned that the Chrysler was a rental car. It had no outstanding warrants or stop requests associated with it.

[¶ 4.] Following the license plate check, the trooper accelerated and again pulled alongside the Chrysler. For the second time, Trooper Swets noticed that both the driver and passenger made no eye contact with him. The trooper thought that further investigation was required. He passed the Chrysler and drove ahead a few miles to a section of Interstate 90 where the speed limit drops from 75 to 65 m.p.h. He positioned his car to await the Chrysler and see if its driver committed a traffic violation.

[¶ 5.] As the Chrysler approached, Trooper Swets obtained a radar reading of 68 m.p.h. However, with foggy conditions and traffic in a construction area, he was unable to safely intercept the vehicle. He radioed ahead to Trooper Matt Oxner, who was patrolling a few miles ahead on eastbound Interstate 90. Trooper Swets asked Trooper Oxner to either obtain a second radar reading of the Chrysler or stop the vehicle for the earlier speeding violation. Trooper Oxner was unable to get a radar fix on the car. At 9:29 a.m. Trooper Swets was able to pull the Chrysler over himself. Trooper Oxner arrived at the scene shortly afterwards. Each of the troopers was accompanied by their drug detection dogs.

[¶ 6.] Trooper Swets exited his car and approached the vehicle. When asked to produce a driver's license, proof of insurance, rental agreement, and registration, the driver of the car opened the glove compartment. It revealed a plastic bag filled with toiletries, a prescription medicine bottle, and a fruit scented air freshener. Trooper Swets asked both occupants where they were headed and where they were coming from. Both replied that they were going back home to Texas and that they were coming from Montana. The trooper asked why they were in Montana. They responded that they were in Mon-

tana to purchase real estate. After noticing the various items in the glove box, reviewing the documents that the driver handed him, and posing a couple of further questions, Trooper Swets asked the driver to accompany him to the patrol car. The trooper indicated to both the driver and passenger that he was only going to issue a warning ticket for the speeding violation.

[¶ 7.] While Kinnamon was sitting in Trooper Swets's patrol car awaiting a warning ticket, Trooper Oxner had his drug dog, Jake, walk around the Chrysler. At no point during the sniff of the exterior of the car did Trooper Oxner observe his dog indicate on the presence of drugs. Meanwhile, in Trooper Swets's patrol car, the driver was asked if there was anything illegal in the car that would make the dog alert. The trooper also asked the driver for consent to search the car. Trooper Swets observed that the driver appeared overly concerned about the dog circling his car and seemed unusually nervous. Kinnamon, however, denied that anything illegal was in the vehicle and refused consent to search. He said he was in a hurry to get back on the road.

[¶ 8.] In the midst of writing the warning ticket and learning that the passenger was the official renter of the car, Trooper Swets exited his cruiser to ask defendant Lockstedt some questions. On the way, he was informed by Trooper Oxner that Jake did not detect any illegal contraband. Once at the passenger side door, the trooper first asked about the prescription pill bottle. Defendant claimed ownership and told Trooper Swets of the prescription's purpose. The Trooper next requested consent to search the vehicle. Defendant refused. He told the trooper that they were eager to move along on their trip back to Texas.

[¶ 9.] Trooper Swets decided to check the car with Crockett. The driver was still

in the patrol car because the warning ticket had not been completed. The trooper led Crockett around the vehicle twice. On the second time around, Crockett alerted at the crease of the passenger side door. His sniffing intensified, his body lowered to smell either the bottom crease of the passenger's door or under the car, and he spent roughly ten seconds on that side of the vehicle.[1] The dog, however, did not exhibit any behavior, such as jumping or scratching on the car. Trooper Swets then directed him around the front end and started back down the driver's side of the car.

[¶ 10.] On the driver's side, Crockett again caught an odor and sniffed at the seam of the door. The dog remained on the driver's side for roughly five seconds. His sniff was more intense around the seam of the door, and his body turned to an almost perpendicular position in relation to the vehicle. Again, however, Crockett did not show scratching or jumping behavior. Nonetheless, when Trooper Swets tried to pull the dog away from the scent, it resisted and the trooper pulled again, telling him, "I saw that."

[¶ 11.] Trooper Swets guided Crockett to the trunk area. The dog sniffed at the trunk. Then, telling the dog to "get up there" and "get after it," the trooper encouraged Crockett to jump up onto the trunk. Crockett jumped, pawed, and thus "indicated" at the trunk of the Chrysler. With the dog's purported detection of an illicit substance, the troopers acquired the requisite probable cause to conduct a warrantless search of the defendants' vehicle.

See *Illinois v. Caballes,* —— U.S. ——, —— – ——, 125 S.Ct. 834, 837–38, 160 L.Ed.2d 842 (2005).

[¶ 12.] After telling defendant Lockstedt that his dog smelled something illegal in the car, Trooper Swets obtained the car keys from the driver and opened the trunk of the car to conduct a search. He told Trooper Oxner that it was "pretty obvious Crockett was alerting." The troopers found 17 individually wrapped one-pound bags of marijuana. Both the driver and defendant were placed under arrest.[2] A total of ten minutes had elapsed from the time the car was stopped.

[¶ 13.] Along with the illegal substance, the officers also seized a notebook with handwritten annotations of various weights and dollar amounts. Both defendants were charged with conspiracy to distribute, distribution, and possession of more than ten pounds of marijuana. Both moved to suppress the evidence, contending that the stop was not supported by reasonable suspicion and that the warrantless search was unsupported by probable cause. The trial court denied the motion. Following a court trial, both defendants were found guilty. Defendant Lockstedt now appeals, raising the following two issues: (1) "Whether the trial court erred in finding and concluding that Trooper Swets had reasonable suspicion to stop and detain the vehicle in which Lockstedt was a passenger"; and (2) "Whether the trial court erred in finding and concluding that Trooper Swets had probable cause to con-

---

1. The terminology for the behavior of drug detection dogs has changed since our decision in *State v. Chavez,* 2003 SD 93, 668 N.W.2d 89. There, based on the expert testimony, we used the term "alert" to mean that the dog indicated to its handler that it detected the odor of a substance it was trained to detect. In this case, the terms "alert" or "in odor" were used by the experts to describe the dog's innate or involuntary response when sniffing a particular odor. The term "indicate" was used to describe a dog's trained behavior to signal its handler that a target odor is at the location being sniffed.

2. The driver's case is not part of this appeal.

duct a search of the vehicle in which Lockstedt was a passenger."

## Analysis and Decision

▮ [¶ 14.] After hearing conflicting and contradictory testimony in two suppression hearings, the circuit court made a difficult decision on whether and when Crockett "indicated" on the presence of illegal drugs. We will not disturb a circuit court's findings of fact unless they are clearly erroneous in light of the entire record. *State v. Guthrie*, 2001 SD 61, ¶ 56, 627 N.W.2d 401, 423 (citation omitted); SDCL 23A–32–9. We think it particularly fitting, though, that when a trial court's factual findings are premised on witness credibility, we should give especially strong deference to those findings. Indeed, with rulings on suppression motions, we view the evidence in a light most favorable to the court's findings of fact. *State v. Tilton*, 1997 SD 28, ¶ 21, 561 N.W.2d 660, 665 (citations omitted). When it comes to deciding whose testimony should be believed, a transcript is no substitute for a judge's firsthand observation. On the other hand, a circuit court's decision on reasonable suspicion and probable cause principles raise mixed questions of fact and law, which we review *de novo*. *Ornelas v. United States*, 517 U.S. 690, 696–99, 116 S.Ct. 1657, 1661–63, 134 L.Ed.2d 911 (1996); *State v. Stanga*, 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488. *Cf. United States v. Alverez*, 235 F.3d 1086, 1088 (8thCir.2000).

### A. Reasonable Suspicion to Stop Vehicle

▮ [¶ 15.] Lockstedt argues that his constitutional right to be free from illegal search and seizure was violated. He says that Trooper Swets's testimony was contradicted by Trooper Oxner's. Although Trooper Swets's testimony during the first suppression hearing established that the car was speeding, Lockstedt asserts that Trooper Oxner's reluctance or, perhaps, failure to pull over the vehicle before Trooper Swets demonstrates the inconsistency between the two troopers' stories. As Lockstedt would have it, the conflicting testimony between the two troopers illustrates that the stop was not for a traffic violation, but to gratify Trooper Swets's hunch.

▮ [¶ 16.] The Fourth Amendment of our Federal Constitution and Article VI, Section Eleven, of our State Constitution protects citizens from unreasonable searches and seizures. US Const amend IV; SD Const art VI, § 11. Although probable cause is generally required for a search, " '[t]he requisite level of suspicion necessary to effectuate the stop of a vehicle is not equivalent to probable cause necessary for an arrest or a search warrant.' " *Chavez*, 2003 SD 93, ¶ 15, 668 N.W.2d at 95 (following *State v. Barton*, 2001 SD 52, ¶ 13, 625 N.W.2d 275, 279). Law enforcement officers are only required to show " 'a reasonable suspicion to stop an automobile.' " *Id.* (quoting *Barton*, 2001 SD 52, ¶ 13, 625 N.W.2d at 279). That is, an officer "must have 'specific and articulable suspicion of a violation.' " *State v. Ballard*, 2000 SD 134, ¶ 11, 617 N.W.2d 837, 840 (citations omitted). Therefore, the basis needed for a traffic stop is minimal. *Chavez*, 2003 SD 93, ¶ 15, 668 N.W.2d at 95 (referencing *Barton*, 2001 SD 52, ¶ 13, 625 N.W.2d at 279 (citing *State v. Sleep*, 1999 SD 19, ¶ 7, 590 N.W.2d 235, 238)).

▮ [¶ 17.] "While the stop may not be the product of mere whim, caprice or idle curiosity, it is enough that the stop is based upon 'specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant the intrusion.' " *Id.* ¶ 16 (quoting *State v. Herrboldt*, 1999 SD 55, ¶ 7, 593 N.W.2d 805, 808 (following *Spenner v. City of*

*Sioux Falls,* 1998 SD 56, ¶ 14, 580 N.W.2d 606, 611)) (alterations omitted). Thus, a traffic violation, however minor, is sufficient to justify the stop of a vehicle. *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996); *State v. Kenyon,* 2002 SD 111, ¶ 16, 651 N.W.2d 269, 274.

[¶ 18.] The trial court found that driving "three to four miles over the speed limit . . . is clearly not the type of violation that would give rise to a stop under normal circumstances." However, the court ultimately declared that even "[t]hough the stop was clearly pretextual, based on the testimony of the officer there was a minimal law violation." We agree that Trooper Swets had a specific and articulable suspicion of a traffic violation sufficient to justify the stop of the Chrysler.

[¶ 19.] The assertion that the stop was pretextual fails because Trooper Swets had an objective basis for stopping the defendants' car. Initially, the trooper's motive was to find something to substantiate the stop of the vehicle. The trooper, when first observing the Chrysler, may have wanted to pull the car over but at that point possessed no reasonable, legal cause to warrant a stop. Several miles later, however, Trooper Swets obtained the requisite legal justification: the car was traveling three miles over the posted speed limit. As a result, the trooper "articulated specific non-pretextual facts which, taken together with rational inferences from those facts, reasonably warranted the traffic stop." *Chavez,* 2003 SD 93, ¶ 19, 668 N.W.2d at 96 (citing *Kenyon,* 2002 SD 111, ¶ 15, 651 N.W.2d at 273–74; *Barton,* 2001 SD 52, ¶ 16, 625 N.W.2d at 279).

[¶ 20.] Because the traffic violation was an objective justification for the traffic stop and detention, there was reasonable suspicion for the stop and traffic investigation regardless of the officer's subjective intent. As we have previously noted, even if an officer has subjective reasons for stopping someone, "those subjective reasons [are] not relevant." *Id.* ¶ 20. "[A]n objectively reasonable stop [will] not [be] invalidated even if the stop was pretextual." *Id.* (quoting *State v. Lamont,* 2001 SD 92, ¶ 21, 631 N.W.2d 603, 610 (citing *Arkansas v. Sullivan,* 532 U.S. 769, 772, 121 S.Ct. 1876, 1878, 149 L.Ed.2d 994, 998 (2001))). Accordingly, the circuit court did not err in concluding that reasonable suspicion existed to stop the vehicle. The court's findings of fact and conclusions of law are clearly supported in the record.

**B. Probable Cause to Search Vehicle**

[¶ 21.] Defendant next argues that the circuit court erred in its finding that probable cause was established for the warrantless search of the automobile. In particular, defendant maintains that Crockett did not "indicate" or make a "defined final response" when sniffing the exterior of the car.[3] Rather, defendant asserts, Crockett was cued or encouraged to indicate at the trunk. And because the trial court's pronouncement that Crockett indicated at the passenger and driver's side door seams appears unsupported in the record, defendant argues that the findings of fact are clearly erroneous.

[¶ 22.] The circuit court heard considerable evidence on whether Crockett "alerted" or "indicated" at the vehicle. The court viewed two videotape recordings of the stop, took the testimony of Trooper Swets, and heard the opinion of two experts. At the conclusion of the second and final suppression hearing, the court orally pronounced its findings, which were later

---

3. There is no evidence here that the traffic stop was unlawfully prolonged in order to permit time for the dog sniff. *See Caballes,* 125 S.Ct. at 834.

incorporated into the trial court's written findings of fact and conclusions of law. In its oral decision, the court said:

> The Court, of course, is not a practiced dog person. I have to choose the truth of the matter based upon the evidence presented to the Court. And it becomes extremely foggy.
>
> As to the incident at the ... trunk, I have reservations, significant reservations concerning the officer's intentional indication by whistling, by commands, by tapping the trunk to elicit a response from the dog. Now, whether that was done for—pursuant to training and to elicit a very specific response or whether it was done to elicit a natural, appropriate response is an issue for the Court. And the Court—the officer testified he did it on purpose for the purposes of the Court's understanding of the dog's observations. However, prior to that time, there was only an alert that occurred, not an indication. However, the dog in the mind of this Court at the driver's side door alerted on two occasions and indicated on two occasions, which this Court would deem to be appropriate and sufficient evidence to support probable cause to believe there may be contraband within the vehicle. And that alert at the passenger door was itself or the driver's door was itself sufficient and very definitive in the mind of this Court to support probable cause and the Court will deny the request to suppress.

In its written findings of fact and conclusions of law, the court only stated that "Crockett gave an indication of a recognizable odor which established probable cause to conduct the search of the automobile" and that "Crockett gave an indication that [an] odor of an illegal substance was emanating from the vehicle."

[¶ 23.] We must determine whether the record supports the circuit court's findings and conclusions. The testimony is contradictory.

Q. [Prosecutor] Can you explain to the Judge what coming into odor means in relation to your dog?

A. [Trooper Swets] We use the term coming into odor, what we're saying is that our dog is smelling the odor he is trained to detect. So that would be he's smelling the odor of marijuana, cocaine, methamphetamine, psilocybin mushrooms, heroin.

Q. What does indication mean, Officer?

A. Indication is the trained behavior where the dog scratches, bites, stares, sits or lays.

\*   \*   \*   \*   \*   \*

Q. Did you see your dog coming into odor during the time you were circling him around ... [the car]?

A. Yes, I did.

Q. Approximately how many times did you see him come into odor?

A. Four times.

Q. Did you see him do anything to indicate?

A. Yes, sir.

Q. And what did he do?

A. He scratched. He locked up on the passenger side and the driver's side and then scratched at the trunk.

Q. Now, does the video depict that you had to pull your dog off of the seam, door seam?

A. Yes, it does.

Q. What does that suggest to you as a handler?

A. That the dog was smelling the odor he was trained to detect and wanted to go back to it.

Q. Is there any doubt in your mind that your dog came into odor on that day?

A. No, sir.

[¶ 24.] On cross examination, defense counsel established with Trooper Swets that the terms "coming into odor" and "alert" are synonymous. Then defense counsel continued:

Q. [Defense Attorney Frederick] So now we have at least three different alerts that this dog does; the perpendicular motion, the lock-up and stare motion—I'm sorry, four. The body stiffening and the long, hard sniffs. Correct?

A. Those are all behaviors that I look at, yes, ma'am. *The lock-up and stare would be considered an indication.*

\*     \*     \*     \*     \*     \*

A. Those are, um, behaviors that—that some are going to be considered as indication, some are in conjunction with the alert. I wouldn't exactly know how to categorize them as far as alert, indication. That would be something you would want to refer to the—to the [State's expert].

\*     \*     \*     \*     \*     \*

Q. All right. What is your dog's trained final response?

A. Crockett's—Crockett's indication, um, towards the end of his career was passive.[4] *He would lock up and stare.* At times he would scratch. Um, it—he made the decision independent on the day, and *sometimes he would scratch and sometimes he would just lock up and stare.*

\*     \*     \*     \*     \*     \*

Q. And describe to me or to the Court where your dog alerted.

\*     \*     \*     \*     \*     \*

A. I first saw my dog come into odor at the trunk of the vehicle.

Q. Okay. So that must have been after you had already completed one pass, correct?

A. It was at the end of my first lap, yes, ma'am.

Q. Okay. All right. Where did the dog as you testified indicate?

A. At the trunk.

Q. Was that when he came into alert?

A. That was on the second pass.

\*     \*     \*     \*     \*     \*

Q. Okay. So then you take your dog around the vehicle. You testified that the first time it initially came into odor was when you had almost completed your first lap at the trunk and then you stated that he indicated at the trunk at the end of your second—second lap, right?

A. That's what I stated, ma'am, yes, ma'am.

Q. What is your dog's indication?

A. My dog may—may scratch, um, or he may lock up and stare.

Q. Well, I'm just asking, what was his indication in this particular case?

A. He scratched.

Q. How did he scratch?

A. Using his front paws.

Q. Where did he scratch?

A. Ah, at the trunk seam.

Q. On the ground, on the vehicle?

A. On the vehicle.

Q. So he jumped on the vehicle?

A. Yes, ma'am, he did.

Q. Is that part of the indication?

A. Yes, he's supposed to scratch at where he believes the odor's coming from.

---

4. Crockett is now retired.

Q. Okay. So jumping and scratching is part of the indication?

A. Scratching is the indication.

Q. Jumping on the bumper?

A. The scratching behavior is the indication. He obviously has to jump on to the bumper to scratch at the source, so—um, but the scratching behavior is what I would consider the indication.

\* \* \* \* \* \*

Q. [Defense Attorney Rensch] But when he finds an odor of an illegal drug, two things happen. One would be the alert and secondly would be the indication, either passive or aggressive, right?

A. [Trooper Swets] Yes, sir.

. . . .

Q. Okay. And you're telling us the alert is the—is what?

A. As I stated, it's—it's the change in his breathing pattern, his sniff intensifying, his body stiffening.

Q. Okay. Okay. In this particular case then, you say this dog alerted how many times?

A. Three or four, excuse me.

Q. Four times?

A. Four times.

Q. The first time, the first go-around, was on what position of the vehicle?

A. On the trunk.

Q. Okay. The second time or the second alert was where?

A. The passenger side door seam.

Q. Okay. That would have been the second time you passed it?

A. That's—that's correct.

Q. You go around the front of the vehicle and when is the third alert?

A. At the driver's side door seam.

Q. And you come around to the back of the vehicle and when is the fourth alert?

A. At the trunk.

Q. Okay. The first alert at the trunk, how did the dog alert?

A. Ah, the change in his breathing pattern, long, hard sniff.

Q. Okay. The second time at the passenger door, the second alert, how did the dog alert?

A. Same.

Q. Okay. The third time at the driver's door, how did the dog alert?

A. The same.

Q. Okay. The fourth time at the trunk, how did the dog alert?

A. The same.

Q. *How many times did the dog indicate?*

A. *Crockett aggressively indicated at the trunk.*

Q. *Did he indicate [at] any other point?*

A. *Um, he locked up on the—on the passenger side door seam and on the driver's side door seam and stared at it. I didn't allow him to stay at any length, um, so I guess I'm not saying that's—that's allowing him to go into a full indication.*

Q. *Are you saying that he indicated before the fourth alert?*

A. *I'm saying I didn't allow him to go into a full indication.*

Q. *If you didn't allow him to indicate, did he indicate or not before the fourth alert?*

A. *No.*

Q. *Okay. So you have one indication on the particular vehicle in question here; is that correct?*

A. *Yes, sir.*

Q. *And that was the aggressive indication* [?]

A. *Yes, sir.*

Q. *Which you say was him scratching the vehicle; is that right?*

A. *Yes, sir.*

Q. *Which you did not cue or cause* [?]

A. *No.*

Q. *Okay.*

A. *I did encourage it.*

[¶ 25.] At this point, given the admission that the dog indicated only once, with scratching at the trunk, it might seem that our inquiry would focus purely on the dog's behavior at the trunk. But later, as the questioning went on, the answers turned more equivocal on whether the dog also indicated at the door seams.

Q. All right. So when the dog turns perpendicular in conjunction with an alert, you take that as a passive indication; is that not so?

A. As I stated numerous times, sir, I don't know how to categorize my dog turning perpendicular. I don't know how else I can explain it to you. I do not know if that's categorized as an alert or an indication. As I've stated over and over again, sir, I do not know.

\* \* \* \* \* \*

Q. So if he were to stare at the door after he had a long, hard sniff and as he was turning perpendicular to the vehicle, you would take that as a passive indication, right?

A. Yes. If the sniff was the long, hard sniff that I see, you know, that behavior, that alert behavior, and then he turns perpendicular and stares, yes, sir, I will call that an indication.

\* \* \* \*

Q. If you tell us that passive indication constitutes turning perpendicular

when a dog is staring at the door seam after he's alerted, why do you now tell us that you only saw one indication out there on the highway that day?

A. As I stated earlier today in my testimony, I saw him come into odor. He turned perpendicular and I didn't allow him to fully fixate and stay at that point and go into a full indication. I moved him on, sir.

[¶ 26.] Obviously concerned with the dog's behavior at the door seams, the circuit court interjected some questions:

Q. Was there any marijuana found other than in the trunk or any drugs found other than in the trunk?

A. Ah, no, sir.

Q. Why would [Crockett] indicate at the passenger doors then?

A. The odor certainly may be coming out of those locations all the way and may be coming out all the way in the front. I found many times with my dog that, um—that the drugs are in the trunk and the dog indicates to the—to the door seams too. Um, there's—I've had times where my dog didn't indicate at the trunk and indicated at the door seam and the drugs were in the trunk because that's where the odor is getting pushed out at. That's—that's—you know, it's flowing from the trunk into the passenger compartment and coming out at that location, the strongest point there. I—um, that's just what I've observed.

Q. Okay. He indicated at the front passenger door and front driver's door, correct?

A. Um.

Q. Or he alerted I should say.

A. Yeah, he alerted at those door seams, yes, sir, on both the driver and passenger sides

[¶ 27.] After Trooper Swets testified, the defense called Dr. Dan J. Craig, a certified animal behaviorist with long experience in canine and handler training. He has worked with dogs trained to detect explosives and drugs. Most, if not all, of Craig's background was with the United States military and other government agencies. In Craig's opinion, Crockett's ostensible indication at the trunk was cued. From his view of the videotape, he concluded that the dog never indicated at any point before the "handler-cued indication" at the trunk. Craig said that Crockett was "in odor" or "alerted" in his trip around the car, but a dog's alert is its natural, innate behavior. He explained that dogs cannot be trained to have a long, hard sniff because "the dog makes the decision of whatever the odor interest is." Therefore, training a canine "to indicate by exhibiting a long, hard sniff, staring and body stiffening" is of no value. Ultimately, Craig declared, "The only thing of value is the decision-making by the dog which is the defined final response or indication as they've defined it.... The decision is the dog's, not the handler's."

[¶ 28.] The last witness was the State's expert Sergeant David Huntimer of the Sioux Falls Police Department. Huntimer is qualified as a judge for service dogs, and, in that capacity, he recertifies drug detection dogs. He certified Trooper Swets and his dog, Crockett. In his direct testimony, Huntimer stated that Crockett did go "into odor" and "lock up" while sniffing the exterior of the defendants' car. During cross-examination, he elaborated on the terms "alert" and "indication."

Q. [Defense Attorney Rensch] Okay. So an indication without an alert may not be a true indication and you might question that. Is that right?

A. [Huntimer] I would not call it.

Q. You would not call an indication without an alert an indication.

A. That's correct.

Q. And likewise you would not call an alert without an indication.

A. Yes, sir.

Q. You would not call it what?

A. I would not call it as far as searching the vehicle.

Q. Okay. So if there's just an alert without an indication, you wouldn't deem that enough to allow you to search the vehicle; is that correct?

A. I would not.

Q. All right. And that's consistent with your training, your experience, your expertise, right?

A. Yes, sir.

. . . .

Q. [Y]our decision not to search a vehicle based upon an alert or these— the exhibiting of these innate behaviors alone would be consistent with your expertise and training; is that right?

A. That would be correct.

[¶ 29.] Huntimer testified that he knew Crockett was trained as an aggressive indicator, i.e., scratching to signal the presence of drugs. In questions from the judge, Huntimer was asked about the dog's behavior at the trunk.

Q. [Judge] Okay. But then before he started scratching [on the trunk], there was no indication; is that correct?

A. [Huntimer] I would have to say that I can see the dog start to change his breathing, but I don't think anybody else would see it because I know what I'm looking for.

Q. Okay. But that would be an alert response, not an—

A. Yes, sir.

Q. —indication response.

A. That would be correct.

Q. And there was no indication response prior to the dog jumping or touching the license plate.

A. No, sir, there was not.

Thus, Crockett did not indicate by locking up at the trunk before he was encouraged to jump and scratch.

[¶ 30.] On the other hand, Huntimer explained in response to the judge's questions that as the dog became older and developed arthritis its "natural scratch response" diminished. Although he could not see in the videotape that Crockett locked up at the trunk before he was encouraged by Trooper Swets to jump and scratch, he nonetheless confirmed that he saw him lock up at the passenger and driver side door seams. And, in Huntimer's opinion, the "locking up" behavior was an "indication."

## C. Conclusion

[¶ 31.] As to the question whether Crockett indicated at the trunk, the trial court concluded that it had "significant reservations." From our review of the evidence, those reservations were clearly warranted. Neither expert would say from viewing the videotape that the dog indicated there. All the court could determine was that "prior to ... [the] time [of the officer's encouraging the dog's scratching behavior at the trunk], there was only an alert that occurred, not an indication." Thus the court never found that there was an indication at the trunk.

[¶ 32.] On the other hand, the court found that Crockett did indicate the odor of illegal substances at the passenger and driver side door seams. Our inquiry is limited to whether the record supports the trial court's findings of fact, i.e., whether the fact findings were clearly erroneous. Although the testimony was at times unclear, and indeed contradictory, all the testimony demonstrated that the dog alerted at the door seams, that an alert was an innate response to the presence of a scent, and that the dog also locked up at both door seams. The disagreement between the experts was whether the lock up behavior was an indication. Trooper Swets testified that it was not a "full indication." It is clear from the videotape, however, that the trooper thought his dog had signaled the presence of drugs at the driver side door. He had to pull Crockett away, reassuring him by saying, "I saw that." Crockett's behavior at the passenger and driver side doors here is the same behavior we held to be sufficient to create probable cause in *Chavez*, 2003 SD 93, ¶ 23, 668 N.W.2d at 96–97.

[¶ 33.] Although there was certainly conflict in the evidence, the circuit court was within its authority to sort it out. Trial judges not only hear testimony, they also observe demeanor, along with vocal nuance, volume, and intonation. These are not visible in the transcript. Confronted with conflicts in testimony, it is the judge's duty to resolve them where possible. That duty includes addressing questions of credibility and contradiction. As the United States Supreme Court explained in defining the term clearly erroneous:

> The reviewing court oversteps the bounds of its duty ... if it undertakes to duplicate the role of the lower court.... If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the

trier of fact, it would have weighed the evidence differently.

*Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).[5] Considering the evidence in its entirety, we are not left with a definite and firm conviction that the circuit court erred in finding that the drug dog indicated the odor of an illegal substance.

[¶ 34.] Affirmed.

[¶ 35.] GILBERTSON, Chief Justice and ZINTER, Justice, concur.

[¶ 36.] SABERS and MEIERHENRY, Justices, concur in part and dissent in part.

MEIERHENRY, Justice (concurring in part and dissenting in part).

[¶ 37.] I concur on issue I. I respectfully dissent on the second issue and would find the trial court erred in finding probable cause to search.

[¶ 38.] The problem here is that the trial court did "sort out" the testimony and concluded that the drug dog's alert at the car doors was sufficient for probable cause irrespective of the expert and dog handler's testimony. Their testimony indicated that in order for the officers to rely on the dog to establish probable cause, the dog needed to "indicate." A mere "alert" was insufficient to find probable cause. According to the testimony, only the dog's

handler knows for sure whether his dog smells drugs because he is familiar with his dog's idiosyncrasies. For Crockett, an "alert" was only a precursor to coming into a full "indication" of the presence of drugs. It was at the trunk that the dog handler determined Crockett fully "indicated"—not at the doors. The court, however, was not convinced of the indication at the trunk.

[¶ 39.] Drug dogs are not 100% accurate and are fallible. We should, at least, require the state to present evidence of the dog's clear indication of smelling drugs before approving of the search. In other situations, we require an accurate calibration of technical devices in detecting alcohol or illegal substances. Similarly, we should also require the necessity of a clear indication from a drug dog before finding probable cause to search.

[¶ 40.] The trial court's finding that the dog's reaction at the doors presented probable cause is contrary to the testimony and clearly erroneous and should be reversed.

[¶ 41.] SABERS, Justice, joins this special writing.

---

5. The term "clearly erroneous" has the same meaning in criminal cases as it does in civil cases. 2 CHARLES ALAN WRIGHT, FEDERAL PRAC- TICE AND PROCEDURE: CRIMINAL § 374, at 474–75 (3d ed 2000).